**DISTRICT OF COLUMBIA INSURANCE PLACEMENT FACILITY, Petitioner,**

v.

**Walter E. WASHINGTON, as Commissioner of the District of Columbia, and individually, and Edward P. Lombard,[1] Superintendent of Insurance, as the designated agent of the Commissioner, Respondents.**

No. 4869.

District of Columbia Court of Appeals.

Argued May 18, 1970.

Decided Sept. 10, 1970.

<hr/>

John P. Arness, Washington, D. C., with whom David J. Hensler was on the brief, for petitioner.

Leo N. Gorman, Asst. Corp. Counsel, with whom Charles T. Duncan, Corp. Counsel, Hubert B. Pair, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for respondents.

Before KELLY, KERN and GALLAGHER, Associate Judges.

1. Succeeded Albert F. Jordan who was Superintendent of Insurance when this proceeding was filed. A motion for substitution was granted on May 22, 1970.

GALLAGHER, Associate Judge.

This review involves the validity of an order issued by the Superintendent of Insurance for the District of Columbia designating "crime lines" of insurance as basic property insurance under the D.C. Insurance Placement Act.[2]

The District of Columbia Insurance Placement Facility (petitioner) is a statutory association created in accordance with Title XII of the Housing and Urban Development Act of 1968 (HUD Act). Included in the HUD Act is the District of Columbia Insurance Placement Act [3] (D.C. Act). Petitioner was established under the express provisions of the D.C. Act.[4] Its purpose as the Insurance Placement Facility is to implement in the District of Columbia the federal program of establishing and effectuating statewide plans "to assure fair access to insurance requirements (FAIR plans)." [5]

A plan of operation was drafted by the insurers, and approved by the D. C. Superintendent of Insurance, which limited the definition of basic property insurance to risks as defined and limited in the standard fire policy and extended coverage endorsement. It did not include insurance against the perils of crime.

Subsequently, on October 4, 1968, as provided in the D.C. Act [6] the Superintendent of Insurance [7] requested petitioner (the Facility) to propose rules and regulations within thirty days by which the Facility would provide crime insurance, including burglary, theft, vandalism and malicious mischief. The Facility refused to propose such rules and regulations asserting that neither the Facility nor the Commissioner

had the authority to do so until the Secretary of HUD designates by rule such types of insurance as "essential property insurance." On November 22, 1968, the Superintendent again requested proposed rules and regulations for these crime risks, stating that federal reinsurance was available.

The Facility thereupon instituted an action on December 6, 1968 in the United States District Court for the District of Columbia for a declaratory judgment holding that neither the Commissioner (or the Superintendent as his agent), nor the Facility has the authority to propose or adopt such rules or regulations until such time as the Secretary of HUD does so by rule. On the same date, the Facility advised the Corporation Counsel of the suit and requested to be advised if any action were contemplated notwithstanding the pendency of the litigation. Shortly thereafter, on December 18, 1968, and without further notice, the Superintendent issued an order amending the definition of basic property insurance to include "vandalism and malicious mischief * * * burglary and theft, and those portions of multi-peril policies covering perils similar to those named herein."

On January 3, 1969, the Facility filed in this court a petition for review, or in the alternative, a motion for an extension of time within which to file a petition for review. This court treated the pleading as a petition for review and stayed action on it pending the outcome of the declaratory judgment suit in the United States District Court. That court dismissed the declaratory judgment action ruling that jurisdiction was vested in this court. This was affirmed by the United States Court of Appeals for this circuit.[8]

---

2. D.C.Code 1967, § 35–1701 et seq. (Supp. III, 1970).

3. *Id.*

4. *Id.* § 35–1703.

5. 12 U.S.C. § 1749bbb–3 (1969).

6. D.C.Code 1967, § 35–1704(b) (Supp. III, 1970).

7. The Superintendent of Insurance is the designated agent for the Commissioner of the District of Columbia. The respondents will hereafter be referred to as the Superintendent.

8. District of Columbia Ins. Placement Facility v. Washington, U.S.App.D.C., (Unpub. Order No. 22,967, dated December 24, 1969).

The Facility contends here that (a) the order issued by the Superintendent is not final, and hence, not reviewable, (b) the Superintendent lacks statutory authority to direct the Facility to issue crime insurance, and (c) the order was issued in violation of the Facility's right to due process of law.

The government argues that (a) the order is final as it imposes an obligation on the Facility to provide insurance coverage for the crimes enumerated, (b) the Superintendent may act independently and need not await action by the Secretary of HUD to expand insurance coverage to include crime lines, and (c) there was no denial of due process in issuing the order as there has been no attempted taking of the Facility's property.

It is evident that the procedural situation is rather anomalous. Though petitioning for review, petitioner says the order is not reviewable because it is not final. Respondents, on the other hand, say it is final and seem to be seeking an advisory opinion on the statutory authority of the Superintendent to issue the order. Be that as it may, we need not pause to discuss the procedural niceties in view of our disposition of this proceeding. Before going further, however, it is helpful to understand the legislative purpose and the statutory scheme.

In enacting the Urban Property Protection and Reinsurance Act of 1968 (which is a separate Title of the HUD Act of 1968) Congress found [9] that the vitality of many of our cities is being threatened by the deterioration of their inner city areas. One aspect of this is that many responsible owners of properties in these areas are unable to obtain adequate property insurance coverage against fire, crime and other perils. This hastens the deterioration. Recent civil disorders have brought abnormally high losses to the property insurance industry for which adequate private reinsurance cannot be obtained at a reasonable cost. The capacity of the property insurance industry to provide adequate insurance is threatened; and this insurance protection is essential to the extension of credit in these areas.

The stated Congressional purpose of this Act is to "(1) encourage and assist the various State insurance authorities and the property insurance industry to develop and carry out statewide programs which will make necessary property insurance coverage against * * * fire, crime, and other perils more readily available for * * * properties meeting reasonable underwriting standards; and (2) provide a Federal program of reinsurance against abnormally high property insurance losses resulting from riots and other civil commotion, placing appropriate financial responsibility upon the States to share in such losses." [10]

Congress left it to the various states to enact insurance plans to implement the Congressional purpose though in so doing it set forth minimum criteria to be met by the states. 12 U.S.C. § 1749bbb–3 (1969). Because of its powers to legislate in this jurisdiction, however, Congress enacted the District of Columbia Insurance Placement Act. D.C. Code 1967, § 35–1701 et seq. (Supp. III, 1970). The purpose of this legislation is (1) to assure stability in the property insurance market in this city, (2) to assure the availability of basic property insurance as defined in the Act, (3) in so doing to encourage maximum use of the normal insurance market, and (4) to provide for the equitable distribution among insurers of the responsibility for insuring qualified property in this city for which insurance cannot be obtained through the normal insurance market and to authorize the establishment of a joint underwriting association to provide for reinsurance of

9. See P.L. 90–448, § 1102, *prior to* 82 Stat. 556 (1968), reciting Congressional findings and a declaration of the purposes of the National Insurance Development Program, 12 U.S.C. § 1749bbb et seq. (1969).

10. P.L. 90–448, § 1102, 82 Stat. 556 (1968).

basic property insurance without regard to environmental hazards.[11] It is, as we said, pursuant to this Act [12] that petitioner was established.

It is the duty of the Facility under the supervision of the Superintendent to formulate and administer a program to seek the equitable apportionment among the insurers of basic property insurance (as defined) which may be afforded applicants in this city whose property is insurable in accordance with reasonable standards.[13] The Facility is required to submit for approval proposed rules and regulations necessary to assure all property owners fair access to basic property insurance through the normal insurance market.[14] Basic property insurance is defined as (1) insurance against direct loss to property caused by perils as defined in the standard fire policy and extended coverage endorsement thereon, and (2) such other insurance (including insurance against the perils of vandalism, malicious mischief, burglary, theft, and robbery) as the Superintendent may designate from those lines of property insurance for which reinsurance is available for losses from riots or civil disorders under the National Housing Act.[15]

It was when the Superintendent pressed the Facility to prepare rules and regulations expanding the "basic property insurance" to include the "crime lines" that the Facility challenged the authority to do so in the declaratory judgment action in the District Court. And it was when the Superintendent followed this action by the issuance of the order requiring inclusion of the "crime lines" that the Facility filed the petition to review in this court.

▆ This brings us to the threshold question of whether the Superintendent had the authority to issue the order which

included the "crime lines" since the Secretary of HUD had not yet incorporated them into the definition of "essential property insurance" under the provisions of 12 U.S.C. § 1749bbb–2 (1969).

We think the Superintendent [16] has the authority to proceed toward an expansion of the insurance coverage to include the "crime lines" without awaiting the issuance of a rule to this end by the Secretary of HUD. As we read the legislation, the state insurance authorities (including the District of Columbia) are intended to be "self-starters" with supervision and guidance of their activities being vested in the Secretary of HUD.

Turning first to the D.C. Act under which the Facility was created and operates, we find that it states one of its purposes is "to assure the availability of basic property insurance as defined" in the Act. D.C. Code 1967, § 35–1701(2) (Supp. III, 1970). (Emphasis added.) Included in the definition of basic property insurance are the "crime lines" if they are so designated by the Superintendent under regulations adopted pursuant to the procedural provisions of the Act and if reinsurance is available. D.C. Code 1967, § 35–1702(2) (Supp. III, 1970). This provision clearly contemplates that the D. C. Superintendent of Insurance is authorized to proceed under the Act on his own motion in relation to the expansion of "basic property insurance" to include the crime lines; and the procedure to be followed is contained in the Act (D.C. Code 1967, § 35–1704 (Supp. III, 1970)), and provides that if the Facility fails to do so, the Superintendent may make such regulations as "he shall deem necessary to carry out the purposes" of the D.C. Placement Act. D.C. Code 1967, § 35–1704(b) (Supp. III, 1970).

11. D.C.Code 1967, § 35–1701 (Supp. III, 1970).

12. *Id.* § 35–1703(a).

13. *Id.*

14. *Id.* § 35–1704(a).

15. *Id.* § 35–1702(2).

16. Acting, as we have said, as the designated agent of the Commissioner for the District of Columbia.

The Facility argues, however, that under the HUD Act the Secretary is authorized to direct by rule that state (and District of Columbia) insurance placement facilities issue crime insurance if he finds such action is necessary and desirable; and that, until the Secretary of HUD acts to require the issuance of crime insurance, to direct petitioner to do so is not "consistent with the requirements of the [HUD Act]." D.C. Code 1967, § 35–1704(b) (Supp. III, 1970).

█ The Facility misconstrues the HUD Act and the D.C. Placement Act. It is true that the Secretary of HUD may by rule designate the crime lines as "essential property insurance" under the HUD Act. 12 U.S.C. § 1749bbb–2 (1969). But nowhere is it provided, expressly or impliedly, that the states must await this action. More importantly, the D.C. Act authorizes the Superintendent to proceed on his own initiative, as we have shown. Furthermore, while the D.C. Act does provide that any rule or regulation issued by the Superintendent shall be consistent with the "requirements of Part A of Title XII of the National Housing Act" (D.C. Code 1967, § 35–1704(b) (Supp. III, 1970)), the latter merely sets forth minimum administrative procedures for the operation of the "FAIR plans" in the several states. To say that the Superintendent may not adopt procedures conflicting with these procedures is not to be construed as preventing the Superintendent from proceeding toward an expansion of the insurance coverage as provided in the Act.

It is interesting to note that the Secretary of HUD differs with the Facility on this contention. There has recently been issued a report by the Federal Insurance Administrator (acting by designation on behalf of the Secretary of HUD) containing the results of his exhaustive investigation on the critical need for, and lack of, crime coverage in the urban centers of several states and the economic havoc that is being wreaked in these areas because of this.[17]

In this report the Federal Administrator concludes that because of the complexities of affording crime insurance, and the variations of the problems in the several states, HUD will not now require the addition of burglary and theft insurance [18] to the "FAIR plans" in the states. The Report also states, however, that in those states "where a critical problem of unavailability of burglary and theft insurance is deemed to exist and the State fails to take prompt action along the lines proposed" in the Report, action will be taken at a later date to deny existing federal riot reinsurance for insurers doing business in the state (pp. 94–98). In so declaring, the Report states the District of Columbia "presents the most serious crime insurance problems in the Nation because of its total urban concentration and high crime rate" (p. 94). Having the benefit of this recent comprehensive study, it is obvious from the Report that as far as HUD is concerned the D.C. Superintendent is expected to proceed with dispatch to tackle the problem of crime insurance coverage in this city without awaiting further action by the Secretary of HUD. This accords with our interpretation of the legislation.

█ This brings us to the procedural aspects of this proceeding. The D.C. Act provides that the Facility shall upon request by the Superintendent submit proposed rules and regulations necessary to assure property owners fair access to basic property insurance. It further provides that if the Facility fails to submit

17. U. S. Dep't of Housing and Urban Development, Federal Insurance Administration, Report on Availability of Crime Insurance and Surety Bonds in Urban Areas (July 2, 1970).

18. Insurance for burglary and theft are the critical needs. The Secretary of HUD ██ recently issued a rule requiring coverage for vandalism and malicious mischief. 35 Fed.Reg. 12113, 12114 (1970). The Report indicates that the latter do not involve economic problems for insurance companies of the magnitude of coverage for burglary and theft (pp. 84–85).

a proposed rule or regulation within the time set the Superintendent may make such rules and regulations covering the proposed subject matter as he shall deem necessary to carry out the purposes of the Act. D.C. Code 1967, § 35–1704 (Supp. III, 1970).

Here, the Facility declined two requests to propose a rule providing for crime insurance and took the position that neither the Superintendent nor the Facility had the authority to do so until the Secretary of HUD had issued a rule requiring this coverage. Instead, the Facility sought a declaratory judgment affirming its position and requested to be advised if the Superintendent proposed further action notwithstanding the pendency of the litigation. Whereupon, with no further notice, the Superintendent issued the order now before us requiring the crime lines coverage.

The Facility contends that since it was given no notice and no opportunity to be heard the order was issued in violation of its constitutional right to due process. Consequently, says the Facility, the effect must be the same as if the order had never been entered.

The government, on the other hand, asserts there is no deprivation of property without due process because the Superintendent has taken no steps to implement the order; and that if the Superintendent's statutory authority to expand insurance coverage to crime lines is judicially confirmed the Facility "will be given ample opportunity through a hearing to express their views and to present documentary evidence. * * * " [19]

We think that, under the circumstances, the Superintendent was precipitous in issuing what purported to be a rule without further notice and opportunity to be heard. On the other hand, the Superintendent apparently realizes the deficiency and in effect asserts the Facility's procedural rights will be protected. This leads us to agree with the Facility that the effect should be as if the order had not been entered.

With this feeling of goodwill abounding there is no need to tarry. We think the sensible solution is to vacate the order and remand the proceeding. The District of Columbia Administrative Procedure Act (D.C.Code 1967, § 1–1501 et seq. (Supp. III, 1970)) is now in effect and its provisions must, of course, be followed throughout the remand proceeding.[20] This would indicate that the proceeding will be initiated by a proposed rule accompanied by an appropriate notice to the public. D.C.Code 1967, § 1–1505 (Supp. III, 1970). It is assumed that the Superintendent will then proceed to a hearing of a type suited to the subject matter and circumstances.[21]

In holding that the Superintendent is statutorily authorized to proceed toward coverage of the "crime lines", it hardly need be added that this is qualified by the substantive constitutional requirements of due process of law.

Order is vacated and case is remanded for further proceedings in accordance with this opinion.

19. Respondents' Brief at 11–12.

20. It should be noted that this Act supersedes other legislation to the extent there may be a conflict. D.C.Code 1967, § 1–1501 (Supp. III, 1970).

21. *See* 1 Davis Administrative Law Treatise § 6.01–6.12 (1958).