112 N.J. Super. 195 (1970)
270 A.2d 723
NEW JERSEY INSURANCE UNDERWRITING ASSOCIATION, APPELLANT,
v.
ROBERT L. CLIFFORD, COMMISSIONER OF INSURANCE OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1970.
Supplemental briefs filed October 2 and October 9, 1970.
Decided November 10, 1970.
*197 Before Judges SULLIVAN, COLLESTER and LABRECQUE.
Mr. Charles H. Hoens, Jr. argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys).
Mrs. Virginia Long Annich, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Appellant New Jersey Insurance Underwriting Association (Association) appeals from a directive by the Commissioner of Insurance (Commissioner) dated June 24, 1970 amending the Association's plan of operation to require that vandalism and malicious mischief insurance endorsements be made available on fire policies issued by its members after July 15, 1970, and requesting that prior to August 1, 1970 it present a proposal to the Commissioner for the writing of burglary and theft coverage. Notice of appeal was filed promptly and, though a stay of the directive was denied, the matter has been accelerated.
By L. 1968, c. 129, now N.J.S.A. 17:37A-1 et seq., the Legislature enacted a mandatory program of property insurance coverage to be carried out under the supervision *198 and control of the then Commissioner of Banking and Insurance, now the Commissioner of Insurance. That statute, which became effective July 2, 1968, created the New Jersey Insurance Underwriting Association (plaintiff herein) to carry out a program of property insurance on behalf of applicants unable to procure such insurance by themselves by reason of environmental factors beyond their control.[1] Under the statute the Association was made up of all insurers authorized to write and engaged in writing property insurance on a direct basis within the State. N.J.S.A. 17:37A-3. The Association was required, within 90 days after the statute went into effect, to formulate plans for carrying into effect the statutory mandate, and to submit them to the Commissioner for review, approval, disapproval or amendment by him. N.J.S.A. 17:37A-7.
The program was to cover "essential property insurance," as defined in the statute. N.J.S.A. 17:37A-8. The statute also authorized the Commissioner to do all things necessary to enable the State, and any insurer participating in any plan approved or issued by him, to fully participate in any federal program of reinsurance "which may be hereafter adopted for purposes similar to the purposes of this act." N.J.S.A. 17:37A-25. One such program, designed to support state F.A.I.R. (Fair Access to Insurance Requirements) plans, was that later provided by 12 U.S.C.A. § 1749bbb et seq. (1968) (the National Insurance Development Program) with which we are here concerned.
Pursuant to the mandate of N.J.S.A. 17:37A-7 the Association submitted a plan of operation to the Commissioner. It was approved by him on November 25, 1968 with *199 a proviso that there be "constructive compliance with the provisions of section 2(a) of chapter 129 of the Laws of 1968." To this end he deemed it necessary that coverage against the perils of vandalism and malicious mischief be made available at once and that burglary and theft coverage be made available not later than June 1, 1969.
When, after long delay, the Association failed to comply, and after correspondents and consultation with the Association's directors, the Commissioner, on June 24, 1970, certified an amendment to the Association's plan of operation which directed that vandalism and malicious mischief endorsements be made available on fire policies issued after July 15, 1970. He also requested the Association to submit a proposal for the writing of burglary and theft coverage by August 1, 1970.
Since the subject of the appeal is a final decision of a state administrative agency, the matter is properly before us. R. 2:2-3(a)(2). Cf. Alberti v. Civil Service Comm'n, 41 N.J. 147, 150-152 (1963).
Appellant raises two points, which may be summarized as follows: (1) the Commissioner was without authority to order it to include vandalism, malicious mischief, burglary and theft in the plan of operation, and (2) assuming he was vested with such authority, his action was procedurally invalid.
We consider them in that order.

I
In essence, the Association contends that N.J.S.A. 17:37A-1 et seq. was part of a joint federal-state program designed to make "essential property insurance" available in urban areas and that it was geared to and dependent upon the availability of reinsurance under the National Insurance Development Program (the federal program). It urges that since the federal program was to cover vandalism, malicious mischief, burglary or theft only if the Secretary of Housing *200 and Urban Development should so designate by rule, and the Secretary had not done so up to the time of the directive here under appeal,[2] the Commissioner was without authority to require such coverage. The Commissioner contends that the challenged directive was authorized by the statute, and this irrespective of whether reinsurance was available under the federal program.
We hold that the Commissioner acted pursuant to the authority conferred by N.J.S.A. 17:37A-1 et seq. in requiring the Association to include vandalism and malicious mischief coverage in its plan of operation and in requesting it to submit a proposal for the writing of burglary and theft coverage. Insurance coverage for the losses authorized to be covered by the statute was not dependent upon the coexistence of a federal reinsurance plan covering the same losses.
N.J.S.A. 17:37A-8 makes it clear that those unable to secure "essential property insurance" from authorized insurers in the normal insurance market are to be afforded coverage through the Association under the conditions therein stated. "Essential property insurance" is defined in N.J.S.A. 17:37A-2(a) as "insurance against direct loss to property as defined and limited in the standard fire policy and extended coverage endorsement thereon, as approved by the commissioner, and insurance for such types, classes and locations of property against the perils of vandalism, malicious mischief, burglary or theft, or such other classes of insurance as the commissioner may designate in order to comply with Federal legislation and obtain Federal reinsurance."
While the legislative intent is to be discerned from the language of the statute, State v. Wean, 86 N.J. Super. 283, 289 (App. Div. 1965), the statutory background, the circumstances of passage and the mischief at which the statute was aimed may weigh heavily in its ascertainment. *201 State v. Wasserman, 75 N.J. Super. 480, 488 (App. Div. 1962), aff'd 39 N.J. 516 (1963). So considered, we are satisfied that the constricted definition of "essential property insurance" advanced by the Association is at variance with the legislative intent. Assembly Concurrent Resolution No. 23 of 1967, which antedated the 1968 report of the National Advisory Panel on Insurance in Riot Affected Areas, stated that:
The practice of insurance carriers of the State of refusing to write, renew and/or arbitrarily canceling existing policies of property insurance (fire and liability), without cause, in certain sections of the State, particularly in the urban and resort areas, is causing great hardship to property owners. This penalizes the owners of good properties with the bad * * *. [Emphasis added]
The 1968 report of the commission of the New Jersey Legislature "to Study the Matter of Refusal of Certain Insurance Companies to Issue Insurance Policies Covering Properties in Certain Portions of this State" noted that "Public recognition of the conditions described in the [Assembly's] statement * * * and public demand for their correction resulted from the widespread `civil disorders' of the summer of 1967, particularly those in Newark in July." The legislative declaration contained in N.J.S.A. 17:37A-1 is to the effect:
[T]hat an adequate market for fire and extended coverage insurance is necessary to attract private capital to central city areas; that without such insurance it is impossible to supply needed goods and services, and expand job opportunities; that orderly community development depends upon an adequate supply of such insurance to enable homeowners to obtain financing for the purchase and improvement of their property; that while the need for such insurance is growing there is reason to believe that the market for same is constricting, and likely to become more constricted in the future; that voluntary efforts to provide fire and extended coverage insurance in areas likely to be unprofitable deserve praise, but are insufficient to meet the needs of these areas; that the State has an obligation to require every insurance company writing fire and extended coverage insurance in New Jersey to meet its public responsibilities, instead of shifting the entire burden to a few public spirited companies; that it is the purpose of this act to accept this obligation; and that any mandatory program to provide fire and extended coverage insurance for all citizens of New Jersey should be supervised *202 by the Commissioner of Banking and Insurance and periodically reviewed in the light of experience and intervening events by the Legislature.
N.J.S.A. 17:37A-1 et seq. had its genesis in Senate Bill No. 712, which was introduced on April 29, 1968, passed the Senate on May 27, passed the Assembly in amended form on June 20, was approved in its amended form by the Senate on June 24 and signed into law on July 2, 1968. As originally introduced it covered only fire and extended coverage insurance, but extended coverage was there defined as including "vandalism or malicious mischief." The act was to take effect on September 1, 1968 and to cease to be of any force on December 31, 1971, save as to policies already issued and obligations incurred thereunder. The Assembly amendments eliminated the restriction to fire and extended coverage insurance and required that "essential property insurance," as defined therein, be made available. They also provided for the funding of the plan through the "New Jersey Insurance Development Fund," advanced the effective date of the statute to July 1, 1968 and deleted the 1971 termination date. In signing the bill into law Governor Hughes expressed the belief that time would "prove it to be landmark legislation both in the field of insurance and in the rebirth of our deteriorating neighborhoods, within and without the cities."
N.J.S.A. 17:37A-1 et seq. was enacted prior to the urban property reinsurance provisions of the United States Code, 12 U.S.C.A. § 1749bbb et seq. (1968), and we may not assume that the Legislature intended it to be meaningless. Union County v. Benesch, 103 N.J. Super. 119, 124 (App. Div. 1968). It is hardly conceivable that, absent a federal reinsurance program, the Legislature intended to leave the Commissioner without power to carry out the salutary purposes it intended. As noted, the "extended coverage" which was required under the bill as originally introduced included, by definition, coverage for vandalism or malicious mischief. In the amended bill "essential property insurance" was *203 substituted for "fire" and "extended coverage." The provisions in the amended bill for the establishment and funding of the New Jersey Insurance Development Fund as a "financial back up" for the plan negate the suggestion that the Commissioner was without power to require more than fire and extended coverage. The fund was to be supported by a surcharge upon "all basic property insurance premiums paid for policies of insurance written in this State." N.J.S.A. 17:37A-20. The surcharge was to be a separate charge to each insured, which the insurer was prohibited from absorbing but was required to collect from the policyholder. N.J.S.A. 17:37A-19 and 20. Under the definition of "basic property insurance," N.J.S.A. 17:37A-2(b), holders of policies covering vandalism and malicious mischief, burglary and theft, were among those required to contribute to the fund to the extent of the statutory surcharge. Deficiencies in the fund were to be met by advances from the State and later repaid. N.J.S.A. 17:37A-23.
We are satisfied that the New Jersey statute was intended to stand alone, regardless of whether, and to what extent, federal reinsurance was available. It was directed at conditions which the Legislature found to exist in this State, and was geared to their amelioration. The federal program was set up to provide minimum criteria for state F.A.I.R. plans, leaving it to the insurance authorities of each individual state to determine the scope of the plan beyond the established minimum. District of Columbia Ins. Placement Fac. v. Washington, 269 A.2d 45 (D.C. Cir.1970); United States Code Congressional and Administrative News, vol. 2, 90th Cong. 2d Sess. (1968), "Legislative History" at pp. 2951-2965. The fact that, in contrast to our own statute, the powers of the Secretary to carry out the three programs included in the National Insurance Development program are to terminate on April 30, 1973, except that the reinsurance program is to continue until April 30, 1976 (by which time the Secretary is directed to submit to Congress a plan for its liquidation and termination), 12 U.S. *204 C.A. § 1749bbb (b) (1) and (2) (1968), further supports the interpretation relied upon by the Commissioner.
The Association further argues that the words (contained in the definition of essential property insurance, N.J.S.A. 17:37A-2(a)), "in order to comply with Federal legislation and obtain Federal reinsurance," qualify the words "vandalism, malicious mischief, burglary, or theft" therein, and thus support its thesis that the legislative intent covered only fire and extended coverage unless federal reinsurance was made available to cover vandalism, malicious mischief, burglary or theft. The difficulty with this contention is that the clause of which the cited qualifying words are a part is set off by itself from the remainder of the paragraph. We are satisfied that the cited phrase was intended to refer to its last antecedent, "such other classes of insurance as the commissioner may designate." See 82 C.J.S. Statutes § 334 at 670 (1953); cf. State v. Wean, supra, at 288. Had the modifying phrase been intended to relate to more than its last antecedent, a comma could have been used to set off the modifier from the entire series. T.I. McCormack Trucking Co. v. United States, 298 F. Supp. 39, 41 (D.C.N.J. 1969).

II
In its brief the Association contended that the Commissioner's action was invalid because it was not preceded by a hearing at which evidence in support of the Commissioner's findings was developed. But N.J.S.A. 17:37A-7(d) does not call for such a hearing. It provides that:
The commissioner may review the plan of operation whenever he deems expedient, and shall review same at least once a year, and may amend said plan after consultation with the directors [of the Association] and upon certification to the directors of such amendment.
The Association does not contend that there was a failure by the Commissioner to consult with its directors. Actually, *205 it is conceded that there were meetings between representatives of the Commissioner and representatives of the directors.
However, in its reply brief the Association raised two issues not raised below, that (1) the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., mandated a hearing, and (2) the omission to hold a hearing was a violation of due process. We disagree as to each.
Initially, we note that there was never a request for hearing by the Association, nor does it appear from the lengthy correspondence between the Association and the Commissioner which preceded the challenged order that it was denied the opportunity to submit any materials, statements or other relevant data. It was then challenging only the Commissioner's authority under the statute to require it to provide coverage for vandalism, malicous mischief, burglary and theft. Thus, absent a factual issue, there was no requirement that a hearing be held. Mississippi River Fuel Corp. v. Federal Power Comm'n, 108 U.S. App. D.C. 284, 281 F.2d 919, 927 (1960), cert. den. 365 U.S. 827, 81 S.Ct. 712, 5 L.Ed.2d 705 (1961). Cf. Railway Express Agency, Inc. v. C.A.B., 120 U.S. App. D.C. 228, 345 F.2d 445, 450 (1965), cert. den. 382 U.S. 879, 86 S.Ct. 162, 15 L.Ed.2d 120 (1965); Handlon v. Belleville, 4 N.J. 99, 104-105 (1950). As a practical matter, the Association has had every opportunity to expound its construction of the statute to the Commissioner, both orally and in writing. See Mississippi River Fuel Corp. v. Federal Power Comm'n, supra.
In a supplemental brief which it was given leave to file following the oral argument, the Association argues that a hearing was necessary on the issue of the advisability and effect of including coverage for burglary and theft in the plan. But the only portion of the Commissioner's directive referable to coverage for burglary and theft required only that the Association submit a plan for such coverage. He specifically refrained from requiring that such coverage be *206 furnished. Until a plan is submitted by the Association (or by the Commissioner) there is no need to determine whether or not a hearing is necessary.
The order of the Commissioner is accordingly affirmed.
NOTES
[1] See the 1968 report of the committee set up by Assembly Concurrent Resolution No. 23 for 1967 (as reconstituted by Senate Concurrent Resolution No. 17 of 1968).

The National Advisory Panel on Insurance in Riot Affected Areas appointed by President Johnson August 10, 1967, in its January 1968 report, called for a federal program of reinsurance to support state F.A.I.R. (Fair Access to Insurance Requirements) plans.
[2] By order dated July 29, 1970 the federal program was expanded to include coverage for vandalism and malicious mischief, effective September 1, 1970. 35 Fed. Reg. 12113, 12114 (1970).