**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0139-18T4

C.R.,

      Plaintiff-Respondent,

v.

M.T.,

      Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**November 13, 2019**

**APPELLATE DIVISION**

      Argued October 3, 2019 – Decided November 13, 2019

      Before Judges Fisher, Gilson and Rose.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FV-08-0021-19.

      Nancy Kennedy Brent argued the cause for appellant (Kennedy Brent Law Firm, attorneys; Nancy Kennedy Brent, on the briefs).

      Andrew Vazquez argued the cause for respondent (South Jersey Legal Services, attorneys; Andrew Vazquez and Kenneth Mark Goldman, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Plaintiff C.R. commenced this action under the Sexual Assault Survivor Protection Act (SASPA), N.J.S.A. 2C:14-13 to -21, seeking to restrain defendant M.T. from having any communications or contact with her. SASPA offers an avenue for the issuance of restraining orders in favor of sexual abuse victims who cannot obtain relief under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. See R.L.U. v. J.P., 457 N.J. Super. 129, 135 (App. Div. 2018). Testimony adduced at a one-day trial revealed the parties did not dispute that sexual contact occurred. Whether plaintiff consented – or was able to consent – to the sexual encounter was and remains the central issue.

The first prong of SASPA requires that the alleged victim demonstrate – by a preponderance of the evidence, N.J.S.A. 2C:14-16(a) – that a sexual encounter was nonconsensual. Lack of consent may be demonstrated by proof of a temporary mental incapacity, N.J.S.A. 2C:14-2(a)(7), which may be generated by the victim's intoxication, N.J.S.A. 2C:14-1(i). The trial judge found plaintiff was so intoxicated that she was unable to consent or object. Having carefully considered the issues raised in this appeal, we conclude that:

- SASPA draws no distinction between voluntary and involuntary intoxication when determining whether an alleged victim lacked the capacity to consent.

A-0139-18T4

- to prove a lack of consent due to intoxication, an alleged victim must prove a "prostration" of "faculties."

- a remand is necessary here because the judge did not apply the prostration of faculties standard when finding plaintiff was incapable of consenting.

Because it is necessary to remand for further findings on the first prong, we choose not to reach defendant's argument about SASPA's second prong, which permits issuance of a restraining order because of "the possibility of future risk to the safety or well-being of the alleged victim." N.J.S.A. 2C:14-16(a)(2).

SASPA's first prong requires that an alleged victim prove, by a preponderance of the evidence, "the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct." N.J.S.A. 2C:14-16(a)(1). We start by observing that plaintiff's claim and defendant's response do not focus on whether sexual contact or sexual penetration did or did not occur. The ultimate fact in dispute concerned whether plaintiff consented to the sexual relations that occurred. This dispute posed separate factual questions: did plaintiff actually express or otherwise convey her consent to engage in sexual relations and, if not, was she intoxicated to a point where she was incapable of consenting.

3

In reviewing the evidence and the trial judge's findings, we note that certain facts were undisputed. On the evening in question, plaintiff and a friend, S.S. (Sylvia, a fictitious name), consumed alcohol while visiting two bars and a friend's house. At the first stop, a bartender eventually refused to serve Sylvia, so the two young women were driven by a friend to another bar. They also called defendant – Sylvia's cousin – who worked at this last bar; they asked that he join them. Defendant declined. The women then continued to drink at the bar until Sylvia was "cut-off." The bartender texted defendant to come and pick up his cousin and plaintiff. Defendant, who lived nearby, soon arrived and told Sylvia and plaintiff they were leaving. When plaintiff protested – because she had not finished her drink – defendant told her to "chug it"; she complied and the three left.

Rather than take the women to Sylvia's residence as they requested, defendant took them to his home. There, defendant went to bed but later joined the young women in their continued drinking. Eventually, defendant convinced Sylvia to go to bed in the guest room, and plaintiff laid down on a couch in another room. It is here the parties' stories diverged.

Defendant claimed plaintiff led him into the garage; plaintiff claimed he carried her there. Plaintiff testified that defendant made sexual demands;

4

plaintiff asserted, in the judge's words, that "she was scared [because] defendant is physically imposing," and she "believed she had no alternative but to comply, so she did."[1]  Plaintiff also testified that prior to sexual penetration, she said, as the judge recounted, "words to the effect of 'I do not want this'"; in the judge's words, if plaintiff's version were to be credited, plaintiff then "revoked whatever consent there could have been" but "defendant did not stop."

Defendant countered plaintiff's claim that she did not consent or was otherwise unwilling.  He testified he had gone to bed but was interrupted when plaintiff asked for a blanket.  He followed her to the couch where plaintiff was planning on sleeping, and they began to "fool around."  Defendant testified that, after a while, plaintiff suggested they go to the garage to avoid the possibility of Sylvia walking in on them.  Defendant then described in his testimony that they engaged in consensual sexual relations in the garage.

If, by a preponderance of the evidence, the judge found plaintiff either verbally or impliedly consented only because she was in fear, or initially consented but then withdrew her consent, the predicate act necessary to establish SASPA's first prong would have been proven.  Permission to engage in sexual

_____

[1]  The judge observed in his findings that "defendant is a physically large and seemingly powerful young man and that the plaintiff is slight of build."

A-0139-18T4

relations must be freely given and that willingness may be inferred from acts or statements reasonably viewed in light of the circumstances. In re M.T.S., 129 N.J. 422, 444 (1992). Plaintiff's version included her claim she only assented out of fear or in the face of a compelling force,[2] and that, at some point in the encounter, she expressed her desire that defendant stop. This would be sufficient under SASPA's first prong. But the judge found the parties' competing versions to be "equally plausible"; in short, he found plaintiff failed to prove her version was more likely true than defendant's. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016). The trial judge's view of the weight of the evidence commands our deference. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974).

Because the judge concluded plaintiff failed to tip the evidential scale in her favor that she refused to engage in sexual conduct, that she consented out of fear, or that she revoked consent during the encounter, the remaining factual dispute about consent turned on whether there was a ground upon which it could be found plaintiff was incapable of consenting.

---

[2] It has long been acknowledged that the concept that a victim must resist – and "to the uttermost" – is obsolete; a victim who submits "to a compelling force, or as a result of being put in fear" has not consented. State v. Harris, 70 N.J. Super. 9, 16-17 (App. Div. 1961).

In ascertaining what the Legislature meant when requiring that alleged victims prove the first prong – an act of "nonconsensual" sexual contact or penetration, N.J.S.A. 2C:14-16(a)(1) – we look to N.J.S.A. 2C:14-2(a)(7), which defines a sexual assault victim as "one whom the actor knew or should have known was" among other things "mentally incapacitated." The phrase "mentally incapacitated" is defined as

> that condition in which a person is rendered temporarily incapable of understanding or controlling his conduct due to the influence of a narcotic, anesthetic, intoxicant, or other substance <u>administered to that person without his prior knowledge or consent</u> . . . .
>
> [N.J.S.A. 2C:14-1(i) (emphasis added).]

This definition of "mentally incapacitated" – when considered in its context – gives some pause because that portion of N.J.S.A. 2C:14-1(i) we underscored above might suggest a requirement that the alleged victim prove her <u>involuntary</u> intoxication, that is, that she ingested intoxicants "administered to [her] without [her] prior knowledge or consent." Since the evidence demonstrated only that plaintiff <u>voluntarily</u> drank on the evening in question, we must determine whether the underscored phrase modifies "intoxicant."

In answering any question about a statute's intent, we look for the plain meaning of the words and phrases the Legislature utilized. <u>State v. Olivero</u>, 221

7                                                        A-0139-18T4

N.J. 632, 639 (2015); McCann v. Clerk of City of Jersey City, 167 N.J. 311, 320 (2001).[3] Because the Legislature listed the substances – "narcotic, anesthetic, intoxicant, or other substance" – that could generate mental incapacity and followed that list with a qualifying phrase – "administered to that person without his prior knowledge or consent" – we necessarily engage the doctrine of the last antecedent, which holds that, absent an apparent contrary intention, "a qualifying phrase within a statute refers to the last antecedent phrase." State v. Gelman, 195 N.J. 475, 484 (2008) (citing 2A Sutherland Statutory Construction § 47.33, at 487-88 (7th ed. 2007)). This doctrine requires our conclusion that the qualifying phrase applies only to "other substance" and not "intoxicant." To convey some other meaning, the Legislature would have had to insert a comma after "other substance," a mere punctuation mark to be sure, but one that would grammatically call for a different result.

Our emphasis on the absent comma may sound like a hyper-technical way to construe statutes. It isn't. Our courts have applied this tenet time and again in construing legislation. See New Jersey Bank v. Palladino, 77 N.J. 33, 45 (1978) (holding, in a similar circumstance, that if "the Legislature had intended

---

[3] We would add there is nothing in the statute's legislative history to illuminate the Legislature's intent on this precise point.

A-0139-18T4

otherwise, it would have inserted a comma after" the last prior antecedent); Morella v. Grand Union/New Jersey Self-Insurers Guar. Ass'n, 391 N.J. Super. 231, 240-41 (App. Div. 2007) (holding that "the use of a 'comma' to separate a modifier from an antecedent phrase indicates an intent to apply the modifier to all previous antecedent phrases"); Gudgeon v. Cty. of Ocean, 135 N.J. Super. 13, 17 (App. Div. 1975) (holding that "[w]here a comma is used to set a modifying phrase off from previous phrases, the modifying phrase applies to all the previous phrases, not just the immediately preceding phrase"); N.J. Ins. Underwriting Ass'n v. Clifford, 112 N.J. Super. 195, 204 (App. Div. 1970) (holding that "[h]ad the modifying phrase been intended to relate to more than its last antecedent, a comma could have been used to set off the modifier from the entire series").  The Legislature undoubtedly acted on the assumption that we would derive the intended meaning of the statute through application of this established doctrine.  See, e.g., State v. Chapland, 187 N.J. 275, 291 (2006).  So, we may confidently conclude the Legislature's omission of a comma after "other substance" was intended to invoke the doctrine of the last antecedent in the construction of N.J.S.A. 2C:14-1(i), thereby conveying the Legislature's intent

that the last phrase would qualify only "other substance."[4] We thus hold that, in seeking relief under SASPA, an alleged victim may prove the lack of consent by proving a mental incapacity brought on by either voluntary or involuntary intoxication.[5]

Having determined that the victim's intoxication – even when produced voluntarily – may support a finding that the victim could not consent, we consider the level of intoxication required to support such a finding.[6] It is

_____

[4] To be sure, the Legislature could have made this point more clearly if it had defined mental incapacity as "that condition in which a person is rendered temporarily incapable of understanding or controlling his or her conduct due to the influence of: (i) a narcotic; (ii) an anesthetic; (iii) an intoxicant; or (iv) some other substance administered to that person without his or her prior knowledge or consent."

[5] It is not unthinkable that a legislature might draw a distinction between voluntary and involuntary intoxication in this setting. In fact, legislatures of at least two states, Arkansas and Hawaii, appear to have drawn such a line. See A.C.A. § 5-14-101(5) (defining "mentally incapacitated" as rendering a person "temporarily incapable of appreciating or controlling the person's conduct as a result of the influence of a controlled or intoxicating substance: (A) [a]dministered to the person without the person's consent; or (B) [t]hat renders the person unaware a sexual act is occurring"); Haw. Rev. Stat. § 707-700 (defining "mentally incapacitated" as referring to a person "rendered temporarily incapable of appraising or controlling the person's conduct as a result of the influence of a substance administered to the person without the person's consent").

[6] While the Legislature drew a precise line when declaring the blood alcohol content that renders unlawful an individual's operation of a motor vehicle, N.J.S.A. 39:4-50, that cannot be the same line for determining when an

10

probably best to consider this question from the standpoint of the well-established meaning of "consent": a "voluntary yielding to what another proposes or desires." Black's Law Dictionary 380 (11th ed. 2019). Stated conversely, an "involuntary yielding" is not consent. Because the question whether plaintiff was able to voluntarily yield to defendant's actions requires consideration of her state of mind at the time, we find an appropriate analogy in the intoxication defense available in the criminal justice setting because that defense challenges the actor's ability to form the state of mind required by the offense charged.

A criminally-accused individual's intoxication will "negative[] an element of the offense," N.J.S.A. 2C:2-8(a), when it produces "a disturbance of mental or physical capacities," N.J.S.A. 2C:2-8(e)(1). The Supreme Court interpreted this latter provision "as intend[ing] nothing different" than the "firmly fixed" concept, State v. Cameron, 104 N.J. 42, 54 (1986), that an accused's intoxication has caused "such prostration of the faculties . . . as puts the accused in such a

_____

individual has voluntarily agreed to engage in sexual relations. The strong public policy that favors keeping our streets and roadways safe from "the senseless havoc and destruction caused by intoxicated drivers," State v. Tischio, 107 N.J. 504, 512 (1987), warranted the placement of a bar lower than that which would logically fix the place where a particular state of mind can or cannot be formed in criminal actions or in cases like this.

state [of being] incapable of forming an intention from which" the accused acted, ibid. (quoting State v. Treficanto, 106 N.J.L. 344, 352 (E. & A. 1929)).

This certainly does not mean that one "who has had a few drinks" meets the standard.  Cameron, 104 N.J. at 54 (quoting State v. Stasio, 78 N.J. 467, 495 (1979) (Pashman, J., concurring and dissenting)).  Far from it.  "The mere intake of even large quantities of alcohol will not suffice."  Stasio, 78 N.J. at 495. When intoxication is proposed as a defense to a criminal charge, it "cannot be established solely by showing that the defendant might not have committed the offense [if] sober."  Ibid. (citing Final Report of the New Jersey Criminal Law Revision Commission, Vol. II, Commentary (1971) at 68).  In short, the intoxication required to reach the "prostration of faculties" standard must be of "an extremely high level."  Cameron, 104 N.J. at 54; see also State v. Mauricio, 117 N.J. 402, 418-19 (1990).

Because the question posed here goes to the same inquiry – ascertaining the intoxicated person's ability to form a particular state of mind – we see no reason not to apply the "prostration of faculties" standard.  The Legislature's silence as to the degree of intoxication required in this context[7] strongly suggests

---

[7] We are mindful the Legislature made reference to intoxication in SASPA by barring courts from denying relief "due to . . . the alleged victim's or the respondent's alleged intoxication."  N.J.S.A. 2C:14-16(b).  In that same

A-0139-18T4

an intention to adopt the familiar standard that has been utilized in criminal matters, as the Cameron Court observed, 104 N.J. at 54, for more than a century in this State. In applying this standard, we conclude that it will not suffice for an alleged victim to prove mere intoxication or that she would not have engaged in sexual relations with the defendant were she not intoxicated. An alleged SASPA victim must prove intoxication to such a degree that her faculties were prostrated to the point of being incapable of consenting to the sexual encounter.

In turning to the judge's findings on intoxication, we start with the fact that the judge did not apply the prostration of faculties standard. The judge only concluded that plaintiff was "extreme[ly] voluntar[il]y intoxicat[ed]" and "visibl[y] intoxicat[ed]." These conclusory descriptors provide little illumination. See Cameron, 104 N.J. at 56 (observing that statements that one was "pretty intoxicated," "pretty bad," and "very intoxicated," "are no more than conclusory labels, of little assistance in determining whether any drinking

---

provision, the Legislature also commanded that relief not be denied because of: the alleged victim's "failure to report the incident to law enforcement"; the fact that the alleged victim "did or did not leave the premises to avoid" the event; or "the absence of signs of physical injury to the alleged victim." Ibid. While, in this fashion, the Legislature may have declared that intoxication could not be used as a ground for denying relief, there is nothing in SASPA to suggest the Legislature meant to treat the role of intoxication – as it applies to the alleged victim's ability to consent – in a manner different from what N.J.S.A. 2C:14-1(i) and Cameron require.

produced a prostration of faculties"). The judge did, however, provide some specifics. He found, for example, that "the young plaintiff consumed at least [ten] if not more alcoholic drinks during the course of the evening," but he did not define how many hours were encompassed by the phrase "the course of the evening" nor did he identify the type of drinks consumed. The judge found that plaintiff and Sylvia drank at Sylvia's home and two bars, that bartenders refused to continue to serve Sylvia,[8] and that once at defendant's residence, plaintiff had three more drinks. These findings relate to some of the indicia the Cameron Court deemed relevant when it called for a consideration of "the quantity of intoxicant consumed" and "the period of time involved." Id. at 56. But the Cameron Court also found relevant: "the actor's conduct as perceived by others," what the actor "said" and how the actor "said it," how the actor "appeared" and "acted," the actor's "coordination or lack thereof" and how that "manifested itself[,]" whether there was an "odor of alcohol," the results of any blood-alcohol tests, "and the actor's ability to recall significant events." Ibid. The evidence adduced at trial did not necessarily produce useful information on all these factors that may explain why the judge did not make findings on some of these

_____

[8] There was no assertion that either bartender refused to serve plaintiff.

14

components. The judge did find, though, that plaintiff was able "to recall the significant events," despite her testimony that she was unable to recall some "details"[9] and her memory was "hazy" about others. In the final analysis, we will not attempt to discern whether the judge's specific findings about plaintiff's intoxication might be interpreted as the equivalent of a finding that plaintiff's faculties were prostrated.[10] We instead remand for further consideration of the issue now that we have determined the correct standard to be applied.

To summarize, we conclude that mere intoxication will not suffice; to prove a mental incapacity caused by intoxication, the alleged victim must demonstrate by a preponderance of the evidence that her faculties were prostrated. Because the judge did not apply this standard, we remand for further

---

[9] In asserting an inability to recall "exact details," plaintiff was able to recall with detail some of the events preceding the sexual encounter, including "walking around in the main area [of defendant's home] for what felt like hours . . . trying" to get Sylvia to go to bed and how Sylvia kept "coming back out." She was also able to remember and describe a telephone call with a friend who had just learned his younger brother had been diagnosed with cancer. She recalled that her friend was angry with her "for being so drunk" and she remembered defendant putting her "over his shoulder and carr[ying] [her] into the house." She also provided many specifics about the sexual encounter.

[10] For the same reason, we do not defer to the judge's conclusion that "plaintiff's extreme voluntary intoxication rendered her 'temporarily incapable of understanding the nature of her conduct,'" because that ultimate conclusion was reached without any apparent application of the prostration of faculties standard.

A-0139-18T4

findings. The judge may reopen the record to allow for additional testimony on this or any other subject if he concludes it would be helpful in analyzing and reconsidering not only the intoxication issue but all aspects of the consent issue.

We also do not foreclose the judge's receipt of additional testimony or his further amplification of his second prong findings, which we do not otherwise address at this time, despite defendant's contention that the evidence was inadequate and the findings speculative.

* * *

Remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION