144 N.J. Super. 152 (1976)
365 A.2d 1
RAYBESTOS-MANHATTAN, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION OF NEW JERSEY; GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; AND RONALD M. HEYMANN, COMMISSIONER OF LABOR AND INDUSTRY OF THE DEPARTMENT OF LABOR AND INDUSTRY OF NEW JERSEY, DEFENDANTS, AND JOHN LEOGRANDE, STANLEY BUCZEK, WALTER BERKENBOSCH, CHARLES PILISZ, JOSEPH FICARRA, CHARLES CZAGAS, JOHN MALENCHAK, STANLEY MAZUR, PETER OSSENKOWSKY, JACK B. JASPER, SIEGMUND STEMCOVSKI, RUDOLPH JOHANSKY, RAYMOND ZOON, WALTER ULENSKI, PETER VAN HAEREN, JOSEPH S. GEMSKI, MICHAEL LELYO, JOHN DUBRORSKY, GENNARO J. APREA, SIGMUND ZAK, ROENEE E. MARTIN, EMORY JOEL BUMBERA, INTERVENING-DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 5, 1976.
*161 Mr. Robert P. Hazlehurst, Jr. and Mr. Joseph S. Fortunato for plaintiff (Messrs. Pitney, Hardin & Kipp, attorneys; Mr. Kenneth Perko, of the New York Bar, of counsel).
Mr. Michael E. Goldman, Deputy Attorney General, for defendants (Mr. William F. Hyland, Attorney General, attorney).
Mr. Pat Di Ianni for the intervening defendants (Mr. Steven Gilson of counsel and on the brief).
LENOX, J.S.C.
In this declaratory judgment action plaintiff Raybestos-Manhattan, Inc. challenges the constitutional validity of the Private Nonvested Pension Benefits Protection Tax Act, L. 1973, c. 124 ("the act") under the Constitutions of New Jersey and the United States.
The act, which after a one-year extension expired July 1, 1975, imposed upon certain employers ceasing operations at a place of employment in New Jersey a tax "equal to the total amount of nonvested pension benefits" of employees who had "completed 15 years of covered service under the pension plan of the employer" prior to the cessation *162 of operations. Pursuant to the act the Director of the Division of Taxation determined that plaintiff was liable for taxes in the amount of $13,474,357.29. Plaintiff disputed its liability and instituted the present action seeking a judicial declaration of the the invalidity of the act.
All parties seek judgment upon the basis of the operative facts which have been stipulated by a pleading filed for that purpose incorporating by reference many voluminous documents. This stipulation was supplemented by other facts submitted upon offers of proof under an agreement admitting the truth of the facts contained in the offers but raising a dispute as to their evidential admissibility. The court has ruled upon the objections interposed, and those offers which survived the objections now also form a part of the factual record.
Plaintiff is a New Jersey corporation which for many years had owned and operated a manufacturing facility in Passaic, producing a wide range of industrial rubber products distributed in a number of states and foreign countries. The genesis of this litigation was a public announcement by plaintiff on October 27, 1972 of its intention to close its Passaic facility and cease the manufacture and sale of industrial rubber products in the United States by June 15, 1973, with the consequence that plaintiff would no longer maintain a place of employment in New Jersey. As of October 27, 1972 plaintiff employed approximately 1,270 persons at its Passaic plant, of which number approximately 1,070 were members of the noncontributory Raybestos-Manhattan Inc. Employee Retirement Plan ("pension plan") executed in 1968 by plaintiff and the two labor unions which represented plaintiff's employees, the Manhattan Rubber Workers Independent Union, Inc. and District 15 of the International Association of Machinists and Aerospace Workers, AFL-CIO ("unions").
The pension plan provided for employee pensioned retirement at age 60 after 30 years of service or at age 65 after 20 years of service. When plaintiff closed its Passaic *163 facility on June 15, 1973, approximately 880 of the 1.070 members of the pension plan did not qualify for pensioned retirement under the terms thereof.
On November 6, 1972 plaintiff negotiated and executed a termination agreement with the unions, wherein plaintiff agreed to provide termination payments and temporary insurance coverage to terminated employees not eligible for pensioned retirement under the pension plan. Plaintiff since has paid over $1,500,000 to its former employees pursuant to this agreement.
On November 20, 1972, 24 days after the announcement of the closing of the Passaic operation, there was introduced in the General Assembly Assembly Bill 1563, entitled "An Act Imposing a Tax Upon Certain Employers for the Benefit of Employees with Nonvested Pension Rights" and cited as "The Emergency Pension Act of 1972" ("Assembly bill"). The Assembly bill assessed a tax upon every employer of 50 or more persons within the State of New Jersey who ceases to operate a place of employment in the State, said tax being the lesser of (1) the highest weekly payroll at the place of employment during the calendar year next preceding the date of cessation of operations, and (2) the "amount of all nonvested pensions of all persons employed by such employer during the year prior to the date the employer ceases to operate such place of employment."
The Senate Committee on Labor, Industry and Professions, after considering the Assembly bill, on February 22, 1973 voted out a substitute entitled "An Act Imposing a Tax Upon Certain Employers, Providing for the Assessment and Collection thereof, and Providing for Disposition of the Revenues Therefrom" and cited as "The Private Nonvested Pension Benefits Protection Tax Act," which was passed by the Senate on March 19, 1973 and by the General Assembly on March 29, 1973. This statute, which is the subject of this litigation, provides in essence that a tax be assessed upon every employer of 500 or more persons within *164 the State who "ceases to operate a place of employment" in the State, said tax being equal to the
* * * total amount of nonvested pension benefits of such employees of the employer who have completed 15 years of covered service under the pension plan of the employer and whose employment was or will be terminated because of the employer's ceasing to operate a place of employment within this State and whose nonvested pension benefits have been or will be forfeited because of such termination of employment, less the amount of such nonvested pension benefits which are compromised or settled to the satisfaction of the commissioner [of Labor and Industry] as provided in this act.
The act defines "ceases to operate a place of employment" as
* * * either the complete termination of operations at a place of employment or a substantial reduction in the number of employees at a place of employment as part of a plan or in connection with an intent to move the business operations at such place of employment outside of the State.
The act further provides that each employee who has completed 15 years of covered service under the pension plan "shall be entitled to make a claim * * * for an immediate payment of the current value of his nonvested pension benefits or a deferred pension benefit * * *." The act provided that it was to take effect immediately upon signature by the Governor and expire and be inoperative after July 1, 1974, but was subsequently extended for one year by L. 1974, c. 66, and finally expired on July 1, 1975.
The act became law on May 9, 1973, and one week later plaintiff, in compliance with the act, notified the Commissioner of Labor and Industry that it intended to close its Passaic plant and cease all business operations in New Jersey on June 15, 1973. On May 29, 1973 the Director of the Division of Taxation entered judgment against plaintiff by filing with the Clerk of the Superior Court a $12,000,000 certificate of debt reflecting his preliminary estimate of plaintiff's tax liability under the act. The Director *165 notified plaintiff, on August 15, 1973, of its tax liability of $13,474,357.29 and that payment thereof was due within 15 days. Plaintiff having failed to pay the assessed amount, a second certificate of debt was filed on October 2, 1973 in the amount of $1,474,357.29, reflecting the tax liability due at that time.
The present action was commenced on June 27, 1973, seeking a declaratory judgment that the act is invalid under the Constitutions of New Jersey and the United States, or, if valid, that the act does not apply to plaintiff. By order of this court on November 2, 1973, the action was bifurcated so as to permit the counts of the complaint relating to the constitutionality of the act to proceed; the order further permitted 22 former employees of plaintiff to intervene as defendants. The parties have extensively briefed the constitutional issues presented and have submitted the matter to the court for decision on cross-motions for judgment upon the stipulated facts.
Plaintiff has mounted a broad-based constitutional attack upon the validity of the act, alleging the following infirmities:
I. The act contains a classification which is arbitrary and without rational basis, rendering it void as (A) special legislation, and (B) violative of the equal protection guarantees of the Constitutions of New Jersey and the United States.
II. The act is arbitrary and unreasonable, serves no legitimate public or governmental purpose sufficient to justify an exercise of the taxing or police powers, and constitutes a taking of private property without just compensation, in derogation of the Constitution of New Jersey and the United States.
III. The act impairs the rights and obligations of plaintiff under its agreements with the unions, in derogation of the Constitutions of New Jersey and the United States.
IV. The act constitutes an unlawful intrusion by the State into an area of labor relations which has been preempted by federal legislation, in violation of the Constitution of the United States.
V. The act unreasonably and unlawfully restricts the free flow of commerce, in violation of the Constitution of the United States.
VI. The act violates the requirement that all revenue-raising bills shall originate in the General Assembly under the Constitution of New Jersey.
*166 Plaintiff presents a two-fold attack on the classification contained in the act, (A) that it is void as special legislation in contravention of N.J. Const. (1947), Art. IV, § VII, pars. 8, 9 and (B) that it denies plaintiff equal protection of the laws as guaranteed by N.J. Const. (1947), Art. I, par. 5 and U.S. Const., Amend. XIV. Both the special legislation prohibition and the equal protection guarantees forbid arbitrary classification which discriminates against some and favors others in like circumstances. See Toms River Affiliates v. Dept. of Environmental Protection, 140 N.J. Super. 135, 148 (App. Div. 1976). Accordingly, at the outset it is necessary to ascertain the parameters of the classification contained within the act.
Section 3 of the act states that the act applies to
* * * every employer, who hereafter ceases to operate a place of employment within this State * * *
The term "employer" is limited by § 2(a) to
* * * any person, firm or corporation who employs 500 or more people within this State at any time within 1 year prior to the date that it ceases to operate a place of employment.
"Ceases to operate a place of employment" is defined by § 2(e) as follows:
[E]ither the complete termination of operations at a place of employment or a substantial reduction in the number of employees at a place of employment as part of a plan or in connection with an intent to move the business operations at such place of employment outside the State. Substantial fluctuations in the number of employees of an employer whose business is of a seasonal nature shall not be deemed to be a ceasing to operate a place of employment except to the extent that a substantial reduction in the number of employees of such employer is attributable to a plan or intention to move the business operations of such an employer outside of the State. When an employer ceases to operate a place of employment but offers to retain all of the employees at another location within the State, this act shall not apply.
*167 The parties are in disagreement as to the proper interpretation of § 2(e). Plaintiff argues that the Legislature intended the act to apply to employers who completely terminate operations or substantially reduce the number of employees, in either alternative "as part of a plan or in connection with an intent" to remove operations from the State. Defendants urge, conversely, that the "plan or intent" language applies only to the latter alternative, with the result that every employer who completely terminates operations at a place of employment within the State is subject to the provisions of the act.
The function of the judiciary in construing any statute is to give effect to the legislative intention and purpose. State v. Carter, 64 N.J. 382, 390 (1974); N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972); Roman v. Sharper, 53 N.J. 338, 342 (1969). Section 2(e) is ambiguous. Where two competing interpretations suggest themselves the judicial inquiry is directed to ascertaining the intention of the Legislature, U.S. v. Brandenburg, 144 F.2d 656, 660-661 (3 Cir.1944), and "it is a cardinal rule * * * that full effect should be given, if possible, to every word of a statute. We cannot assume the Legislature used meaningless language." Gabin v. Skyline Cabana Club, 54 N.J. 550, 555 (1969). See also, 2A Sutherland, Statutory Construction (4 ed. Sands, 1973), § 46.06 at 63. In this context consideration must be given to which of the two antecedents in § 2(e) is to be modified by the "plan or intent" clause following them. Under defendants' interpretation the classification contained within the act will be more general than if plaintiff's interpretation prevails, and hence less likely to be declared void as impermissibly restrictive. When a statute may be open to a construction which would render it unconstitutional or permit an unconstitutional application, the judicial branch should accept that construction which renders the statute constitutional, if it is reasonably susceptible of such a construction. State v. Profaci, 56 N.J. 346, 349-350 (1970). *168 This is but a natural concomitant of the strong presumption that a statute is constitutional. Harvey v. Essex Cty. Bd. of Freeholders, 30 N.J. 381, 389 (1959). In construing ambiguous statutory language it is appropriate to act on "the fair assumption that the wishes of the legislative body would be furthered by upholding its prospective goals to the extent constitutionally permissible." Camarco v. Orange, 61 N.J. 463, 466 (1972). It is also an accepted principle of statutory construction that "referential and qualifying phrases refer solely to the last antecedent  where no contrary intention appears." State v. Congdon, 76 N.J. Super. 493, 502 (App. Div. 1962); see also, Gudgeon v. Ocean Cty., 132 N.J. Super. 13, 17 (App. Div. 1975). Accordingly, unless a contrary legislative intent appears, the qualifying "plan or intent" language should not be read as modifying instances where an employer completely terminates his operations.
Where, as in § 2(e) of the act, the intent of the Legislature as to the correct interpretation is not apparent on the face of the statute, the court must scan the legislative history of the enactment in order to determine the legislative purpose. Data Access Systems, Inc. v. State, 63 N.J. 158, 166 (1973); Hudson Cty. News Co. v. Sills, 41 N.J. 220, 226 (1963), app. dism., 378 U.S. 583, 84 S.Ct. 1914, 12 L.Ed.2d 1036 (1964); N.J. Pharmaceutical Ass'n v. Furman, 33 N.J. 121, 130 (1960); see Todd Shipyards v. Weehawkin Tp., 45 N.J. 336, 341 (1965). As stated in State v. Madden, 61 N.J. 377 (1972), in this quest
* * * it is our initial task to seek that intent, and to that end we must consider any history which may be of aid. New Jersey Pharmaceutical Association v. Furman, 33 N.J. 121, 130 (1960). [at 389]
Thus, while it has been argued that the court, in determining the legislative intent, should consider only the statement of purpose appended to the Senate Committee Substitute *169 to the Assembly Bill, it is settled law that consideration may be given to any legislative history which may be of aid in performing the judicial obligation and function. "[O]ur courts have adopted the policy of considering a broad spectrum of information (weighing its credibility and relevance) as a tool in determining the intent of the Legislature." State v. Jersey Central Power and Light Co., 133 N.J. Super. 375, 387 (App. Div. 1975). Among the extrinsic materials presented for consideration and incorporated in the offers of proof are numerous newspaper articles which provide a contemporaneous commentary on the origins of the act and its passage through the Legislature, and a press release containing comments of then-Governor Cahill pertinent to the act. Defendants, while stipulating the fact of the publication and dissemination of these articles and the press release, argue that even if relevant, they are inadmissible hearsay since they are offered to show the truth of the matters stated therein. Evid. R. 63. The press release and newspaper articles undoubtedly constitute hearsay evidence not admissible under any of the traditional exceptions to the hearsay rule. However, our courts have come to consider an ever-widening variety of hearsay materials in ascertaining legislative intention and motivation, including letters written by the person suggesting the legislation, State v. Madden, supra; memoranda prepared by those who drafted the legislation, In re Estate of Lambert, 63 N.J. 448, 452-453 (1973); Data Access Systems, Inc. v. State, supra 63 N.J. at 166-167; newspaper articles, State v. Union Cty. Park Commission, 48 N.J. 246, 251-252 (1966); Lloyd v. Vermeulen, 22 N.J. 200, 209 (1956); the statement appended to a bill at the time of its passage, Deaney v. Linden Thread Co., 19 N.J. 578, 584-585 (1955); Howard Savings Inst. v. Kielb, 38 N.J. 186, 195 (1962); Gudgeon v. Ocean Cty., supra 135 N.J. Super. at 16; the identity of persons or groups sponsoring the legislation in question, Group Health Ins. of N.J. v. Howell, 43 N.J. 104, 112 (1964); Independent Electricians, etc., *170 Ass'n of N.J. v. N.J. Bd. of Examiners, 54 N.J. 466, 470 (1969); see Grand Union Co. v. Sills, 43 N.J. 390, 396-397, 401 (1964); speeches by legislators while the legislation was pending before the Legislature, State v. Jersey Central Power & Light Co., supra 133 N.J. Super. at 383; conditional veto messages applicable to the legislation, Loveladies Prop. Owners Ass'n, Inc. v. Raab, 137 N.J. Super. 179, 184 (App. Div. 1975); Dept. of Heatlh. v. Sol Schnoll Dressed Poultry Co., 102 N.J. Super. 172, 176-177 (App. Div. 1968); Caldwell v. Rochelle Park Tp., 135 N.J. Super. 66, 73-74 (Law Div. 1975), and comments of the Governor at the time of the enactment of the legislation, Irval Realty v. Bd. of Public Utility Comm'rs, 61 N.J. 366, 377 (1972); see Grand Union Co. v. Sills, supra 43 N.J. at 397. Similar materials which have been considered admissible under traditional rules of evidence include recommendations by study commissions which prompted the legislation, Data Access Systems, Inc. v. State, supra 63 N.J. at 165. In re In-Progress Trace Wire Communication, 138 N.J. Super. 404, 410 (App. Div. 1975); Reale v. Wayne Tp., 132 N.J. Super. 100, 108 (Law Div. 1975); Tenafly v. Centex Homes Corp., 139 N.J. Super. 490, 495 (Law Div. 1975); Anske v. Palisades Park, 139 N.J. Super. 342, 346 (App. Div. 1976), and text commentators' remarks regarding a statute, Data Access Systems, Inc. v. State, supra 63 N.J. at 164-165. A reviewing court may also include in its consideration of legislative history materials which may never have met the legislative eye. Data Access Systems, Inc. v. State, supra at 166-167. A review of these case authorities confirms that hearsay evidence of the nature of that offered by plaintiff is admissible as an aid to the court in its determination of legislative intention or motivation. On one occasion the use of the hearsay evidence so admitted was limited to confirmation of an intent already established by other evidence. Data Access Systems, Inc. v. State, supra. On other occasions the court has not so limited its use of such hearsay evidence, e.g., In re Estate *171 of Lambert, State v. Madden and Irval Realty v. Bd. of Public Utility Comm'rs, all supra. Accordingly, if necessary, it is appropriate in this case to consider the proffered newspaper articles and press release as relevant and material aids in ascertaining the meaning of the statutory language.
Plaintiff urges that dramatic evidence of legislative intent relevant to the proper interpretation of § 2(e) may be found in the Senate Committee Substitute Bill which preceded the act as finally enacted. Section 2(e) of the Committee Substitute contained a comma before the phrase "or a substantial reduction in the number of employees," so that it read as follows:
"Ceases to operate a place of employment" means the complete termination of operations at a place of employment, or a substantial reduction in the number of employees at a place of employment as part of a plan or in connection with an intent to move the business operations at such place of employment outside of the State * * *.
The argument presented is that the placement of the comma in this predecessor of § 2(e) of the act evidences an erstwhile intent by the Legislature to have the phrase "as part of a plan or in connection with an intent to move the business operations at such place of employment outside of the State" modify only "a substantial reduction in the number of employees." While the absence of such a comma in the act as finally passed may be evidential of an intent by the Legislature to have the "plan or intent" language modify both the complete termination and substantial reduction situations, the more persuasive argument is to the contrary.
A similar problem was confronted in N.J. Ins. Underwriting Ass'n v. Clifford, 112 N.J. Super. 195 (App. Div. 1970), where, in construing the definition of "essential property insurance" as contained in N.J.S.A. 17:37A-2(a), it was stated:
* * * We are satisfied that the cited phrase was intended to refer to its last antecedent, "such other classes of insurance as the commissioner *172 may designate." See 82 C.J.S. Statutes § 334 at 670 (1953); cf. State v. Wean, supra, 86 N.J. Super. at 288. Had the modifying phrase been intended to relate to more than its last antecedent, a comma could have been used to set off the modifier from the entire series. T.I. McCormack Trucking Co. v. United States, 298 F. Supp. 39, 41 (D.C.N.J. 1969). [112 N.J. Super. at 204]
Although punctuation is to be considered when interpreting a legislative enactment, Moore v. Magor Car Corp., 27 N.J. 82, 87 (1958), it must be weighed against other factors indicative thereof and cannot be relied upon to distort an otherwise apparent meaning. See Weinacht v. Bergen Cty. Bd. of Chosen Freeholders, 3 N.J. 330, 334 (1949); State v. Madewell, 117 N.J. Super. 392, 396 (App. Div. 1967), aff'd 63 N.J. 506 (1973). It is noteworthy that the final sentence of § 2(e) provides that
When an employer ceases to operate a place of employment but offers to retain all of the employees at another location within the State, this act shall not apply.
By exempting from the tax those employers offering to retain their employees at another location within the State, the final sentence of § 2(e) is indicative of a statutory purpose of providing protection to employees against the loss of their unvested pension benefits. This conclusion is buttressed by the statement attached to the Senate Committee Substitute to the Assembly Bill:
The purpose of this bill is to protect the nonvested pension rights of employees whose employer ceases to operate a place of employment within this State.
Similarly, then-Governor Cahill commented in a press release when signing the act into law that
This legislation affects an area of vital concern not only to me as Governor but also to business and each and every employee throughout the State. The plight of the working man without adequate protection for his retirement under private pension systems is one that cries out for relief.
*173 The loss of pension benefits, the alleviation of which is the object of the act, clearly would occur upon any complete termination of operations by a covered employer, whether or not such termination be prompted by a plan or intent to remove all operations outside the State. Accordingly, it is appropriate to assume that the Legislature intended § 2(e) of the act to extend to any employer completely terminating business operations at a place of employment, whether or not a plan or intent to leave the State be involved.
The act therefore applies to any employer (1) of 500 or more persons within the State (2) who provides said employees with pension benefits (3) who terminates business operations at a place of employment or who substantially reduces the number of employees at a place of employment with intent to relocate outside the State (4) before July 2, 1975, the date on which the act finally expired (5) without offering to employ the affected employees elsewhere in the State. This classification must be weighed against the requirements of the State and Federal Constitutions.
N.J. Const. (1947), Art. IV, § VII, par. 8 provides:
No private, special or local law shall be passed unless public notice of the intention to apply therefor, and of the general object thereof, shall have been previously given. Such notice shall be given at such time and in such manner and shall be so evidenced and the evidence thereof shall be so preserved as may be provided by law.
N.J.S.A. 1:6-1 et seq. set forth the required mode of public notice and proof thereof. N.J. Const. (1947), Art. IV, § VII, par. 9 further provides that
The Legislature shall not pass any private, special or local laws * * * (6) Relating to taxation or exemption therefrom.
The New Jersey Constitution thus prohibits special legislation relating to taxation, while permitting other special legislation not similarly prohibited only where public notice *174 is given in accordance with statute, see Meadowlands Reg. Redevelopment Agency v. State, 63 N.J. 35, 48-49 (1973). This distinction apparently was ignored by the parties, who have directed their attention only to the special legislation prohibition relating to taxation despite their dispute as to whether the act constitutes taxation or an exercise of the police power. The distinction is not crucial, however, since no notice as required by N.J.S.A. 1:6-1 et seq. preceded the passage of the act. Thus, whether taxation or an exercise of the police power, the act is unconstitutional if it constitutes special legislation.
The test for determining whether a statute constitutes special legislation was expressed in Harvey v. Essex Cty. Bd. of Freeholders, supra, where the court said:
In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. If no one is excluded who would be encompassed, the law is general. Another requirement of a general law is that it must affect equally all of a group who, bearing in mind the purpose of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves. [30 N.J. at 389]
In Bayonne v. Palmer, 90 N.J. Super. 245 (Ch. Div. 1966), aff'd 47 N.J. 520 (1966), the test was further enunciated as follows:
The purpose of the constitutional provision is * * * to prevent arbitrary and discriminatory selection of a particular object where other objects existing should also be treated in like manner. If a law embraces the objects reasonably falling within a class which bears a reasonable relationship to the purpose of the legislation, and at the same time does not omit any which have equal reason to be included, the act is general. [90 N.J. Super. at 284; citations omitted]
Accordingly, the function of the judiciary is to determine whether the classification contained within the act is reasonable, embracing all employers who should properly be included within its scope in light of the statutory purpose. Alfred Vail Mut. Ass'n v. New Shrewsbury, 58 N.J. 40 *175 (1971); Roe v. Kervick, 42 N.J. 191, 233 (1964). Since the reasonableness of the classification must be judged in light of the legislative objective, Kline v. N.J. Racing Comm'n, 38 N.J. 109, 118 (1962); Blair v. Erie Lackawanna R.R. Co., 124 N.J. Super. 162, 180 (Law Div. 1973), which objective in the act is the protection of employees against loss of their unvested pension benefits, the issue presented is whether the act, by excluding certain employers from its tax, fails to include all those employees who should reasonably have been afforded its protection.
In so reviewing the classification appropriate consideration must be given to the strong judicial presumption that a statute is constitutional. Male v. Renda Contracting Co., Inc., 64 N.J. 199, 201 (1974), cert. den. 419 U.S. 839, 95 S.Ct. 69, 42 L. Ed 2d 66 (1975); Inganamort v. Fort Lee, 120 N.J. Super. 286, 301 (Law Div. 1972), aff'd 62 N.J. 521 (1973); Toms River Affiliates v. Dept. of Environmental Protection, supra. For the act to be declared unconstitutional its repugnancy to the Constitution must be clear beyond a reasonable doubt, Brunetti v. New Milford, 68 N.J. 576, 599 (1975); Gangemi v. Berry, 25 N.J. 1, 10 (1957), and plaintiff bears a heavy burden in its attempt to disprove the presumed validity. Harvey v. Essex Cty. Bd. of Freeholders, supra 30 N.J. at 388; Yellow Cab Co. of Camden v. State, 126 N.J. Super. 81, 94 (App. Div. 1973), certif. den. 64 N.J. 498 (1974); Jamouneau v. Harner, 16 N.J. 500, 515 (1954); David v. Vesta Co., 45 N.J. 301, 315 (1965); Van Ness v. Deal, 139 N.J. Super. 83, 93 (Ch. Div. 1975).
Even though a statute may be open to a construction which would render it unconstitutional [the court must] so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation. [State v. Profaci, supra 56 N.J. at 350]
See also, Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 422 (1958); Camarco v. Orange, supra 61 N.J. at 466. *176 This concept was well expressed in Blair v. Erie Lackawanna R.R. Co., supra:
Whenever one challenges the constitutional validity of a legislative enactment he undertakes a formidable task, and rightly so, for he is challenging the collective judgment of the elected representatives of the people. A court called upon to measure the validity of such an assault is, in its turn, functioning in one of the most delicate areas of jurisprudence, where it must constantly keep in mind the necessity to interfere as little as possible with the performance of constitutionally charged duties by a coequal branch of government while concurrently meeting its responsibility to safeguard the rights of the individual and to insure adherence by all to the requirements of our State and Federal Constitutions. [124 N.J. Super. at 166]
However, recognition of this judicial philosophy cannot be permitted to deter the judiciary from the performance of its obligation to insure the constitutionality of all legislative action. "[O]ur coordinate branch of government is a human institution, and the product of its labor will, on occasion, reflect unaccountable departures from the usual high seriousness of its deliberations." Trainor v. Newark, 137 N.J. Super. 570, 586 (Law Div. 1975). The judicial branch may not shirk its obligation in the name of presumption of constitutionality when beyond a reasonable doubt there has been an intrusion by the Legislature into an area of constitutional protection. The doctrine of separation of powers, a fundamental principle of American government, mandates affirmative remedial action. Thus while "the court will incline to a construction favoring the validity of a statute," when invalidity thereof plainly appears it will be invalidated. Lynch v. Edgewater, 8 N.J. 279, 290-291 (1951). See Gulf Co. & F.S. Ry. Co. v. Ellis, 165 U.S. 150, 154, 17 S.Ct. 255, 256, 41 L.Ed. 666, 668 (1897), holding that
* * * while good faith and a knowledge of existing conditions on the part of a legislature are to be presumed, yet to carry that presumption to the extent of always holding that there must be some undisclosed or unknown reason for subjecting certain individuals or corporations to hostile and discriminatory legislation *177 is to make the protecting clauses of the Fourteenth Amendment a mere rope of sand, in no manner restraining state action.
Unquestionably, the Legislature has a wide range of discretion in determining statutory inclusion and exclusion of a classification. Wilson v. Long Branch, 27 N.J. 360, 367 (1958). However,
* * * the constitutionality of an act of the legislature is not to be determined by a consideration of verbal or rhetorical niceties; the act must be judged on a broader basis, and according to its effect as a whole. [Lohen v. Thompson, 88 N.J.L. 40, 42 (Sup. Ct. 1915)]
See Thomas and Dawson Const. Co., Inc. v. Kingsley, 85 N.J. Super. 357, 372-373 (Law Div. 1964). The judicial examination must extend beyond the language of an enactment where, considering its purpose and practical effect, it represents a violation of the Constitution. See e.g., Alfred Vail Mut. Ass'n v. New Shrewsbury, supra 58 N.J. at 46; Independent Electricians, etc., Ass'n of N.J. v. New Jersey Bd. of Examiners, supra 54 N.J. at 470. The matter of statutory construction "will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation." Jersey City Property Owners' Protective Ass'n v. Jersey City Council, 55 N.J. 86, 100 (1969); see also State v. Gill, 47 N.J. 441, 445 (1966); Laboda v. Clark Tp., 40 N.J. 424, 435 (1963); Clifton v. Zweir, 36 N.J. 309, 322-323 (1962). In weighing the reasonableness of the classification contained within the act against the legislative objective of safeguarding the unvested pension benefits of employees, attention must be given to the substance and necessary operation of the act as well as to its form, Mason v. Paterson, 120 N.J. Super. 184, 190 (Law Div. 1972), aff'd 62 N.J. 471 (1973); In re Freygang, 46 N.J. Super. 14, 22 (App. Div. 1957), aff'd 25 N.J. 357 (1957), and also to the factual basis for the Legislature's classification, Meadowlands *178 Regional Dev. Agency v. State, 112 N.J. Super. 89, 102 (Ch. Div. 1970), aff'd 63 N.J. 35 (1973).
Initially plaintiff argues that the classification is unreasonable because it exempts from the act those employers who permanently close a place of employment with no plan or intent to remove operations from New Jersey. Since the act applies to all employers who terminate operations at a place of employment, whether or not a plan or intent to leave the State be involved, this argument lacks merit. Plaintiff next asserts that the expiration date of the act (July 1, 1974, later extended to July 1, 1975) unreasonably exempts from its provisions those employers who by "purely fortuitous circumstance" terminate operations after that time. However, the Legislature may limit the term of an otherwise valid enactment if so justified on any rational basis whatsoever. At the time of this enactment there was pending before the Congress comprehensive federal pension legislation (later enacted as the Retirement Income Security for Employees Act of 1974), and the Legislature reasonably may have designed the act to coordinate its expiration with the enactment of the remedial federal legislation. In isolation from the other provisions of the act this aspect may be supported. Also without merit when similarly viewed is the contention that the classification is arbitrary because it includes only employers furnishing pension plans to employees and excludes those who do not. The legislative purpose was to protect existing unvested pension rights, not to create new ones where none previously existed, and the exclusion is reasonably consistent with this purpose.
Plaintiff's final attack upon the reasonableness of the classification is directed to the exemption from the tax of those employers not employing 500 or more persons within the State. Viewing this exclusion with reference to the legislative objective, Kline v. N.J. Racing Comm'n, supra, the issue presented is whether the Legislature reasonably excluded from the protection of the act those persons *179 whose employer does not employ 500 or more people within the State. Legislation which confers pension benefits but unreasonably excludes some who should have received benefits has been invalidated as special legislation, see Erion v. Bd. of Pension Comm'rs, 11 N.J. Misc. 122, 165 A. 102 (Sup. Ct. 1933), and legislation which is intended to protect unvested pension benefits but which irrationally excludes from such protection others who should have been protected is similarly unconstitutional. Although the Legislature is accorded broad discretion in the area of permissible classification, Passaic v. Consolidated Police, etc. Pension Fund Comm'n, 18 N.J. 137, 146 (1955), the court must inquire as to whether any conceivable factual basis existed to support the challenged classification. See Meadowlands Regional Dev. Agency v. State, supra. In this respect the act fails to withstand constitutional scrutiny. There is no rational basis justifying a classification which safeguards the unvested pension benefits of employees of a firm employing 500 persons while excluding from its protection employees of firms employing 400, 300, 200 or fewer persons.
The Senate Committee Statement to the Assembly Bill stated that to carry out the purpose of the legislation the bill would "impose a tax upon every employer who ceases to operate a place of employment within the State." (Emphasis supplied). However, the general nature of the broad classification, "every employer," is lost with the definition of "employer" in § 2(a) of the act. The special nature of the legislation may be seen through the transparent veil of the general language. While it is true that the Legislature must draw some line with respect to inclusion or exclusion of such protection, it is equally true that the basis of classification must be some feature to which the provisions of the enactment are naturally related, Anderson v. Trenton, 42 N.J.L. 486, 488 (Sup. Ct. 1880). Only where the purpose of the law has reasonable relation to magnitude can that characteristic constitutionally be made the basis of classification. Lowthorp v. Trenton, 61 *180 N.J.L. 484, 488 (Sup. Ct. 1898), aff'd 62 N.J.L. 795 (E. & A. 1898). The number of employees in a firm can in no way be logically related to their need for protection of their unvested pension benefits
Defendants argue that this exclusion of small firms from the protections of the act represents a recognition by the Legislature that the closing of such small firms has a less harmful impact on the state economy than the closing of large firms. But this contention, even if true, is without merit, as it is not directed to the standard to be applied. The exclusion must be viewed with reference to the legislative objective. Kline v. N.J. Racing Comm'n, supra, and where the act is designed to protect employees against loss of their pension benefits a consideration relating to the state economy alone will not suffice to justify the exclusion.
Defendants also argue that the Legislature reasonably could have concluded that the imposition of the tax upon small firms would be heavier than upon large firms, possibly resulting in the smaller firms ceasing their business operations or leaving the State. However, the tax imposed by the act is calculated with reference to "the total amount of nonvested pension benefits" earned by the employees, and accordingly would be roughly proportionate in amount to the number of employees of such employers. A small firm would shoulder a small burden and a large firm a correspondingly larger burden. Hence the tax would not impose a burden on employers of less than 500 persons sufficiently disproportionate to reasonably warrant their exemption from the act. Moreover, in many situations the employer taxed by the act would in any event, regardless of the imposition of the tax, be terminating its business in New Jersey.
The employees protected by the act are not, as required, readily distinguishable from those excluded from protection, and are not "distinguished by characteristics sufficiently marked and important to make them a class by themselves." Harvey v. Essex Cty. Bd. of Freeholders, supra, nor is the exclusion of the employees of smaller firms reasonable when *181 judged in light of the legislative objective, Kline v. N.J. Racing Comm'n, supra. Other statutes enacted for the protection of employees have contained far less restrictive classifications, regulating employers of eight or more employees (N.J.S.A. 43:21-19, Unemployment Compensation Law, as originally enacted) and of one or more employees (N.J.S.A. 34:15-1 et seq., Workmen's Compensation Act; N.J.S.A. 34:5-166 et seq., Construction Safety Act; N.J.S.A. 34:6A-1 et seq., Worker Health and Safety Act). The classification contained in the act protects only employees of firms employing 500 or more persons, a classification which is arbitrary and without rational basis, causing the act to be violative of the special legislation prohibitions of the New Jersey Constitution.
In making this determination it must be acknowledged that the judiciary
* * * may not question the wisdom of this statute. The policy decision is the exclusive responsibility of the other branches of government [and the question of whether the statute is] equitable or inequitable, prudent or imprudent, is a matter to be decided exclusively by the legislative and executive branches. [Thomas v. Kingsley, 43 N.J. 524, 530, 534 (1965)] The courts should be hesitant to cut down the scope of a statute because of their own view as to its internal motivation, except where there is * * * clear justification for so doing. [Myerson v. Board of Review, 43 N.J. Super. 196, 202-203, (App. Div. 1957), Singer Sewing Machine Co. v. N.J.U.C.C., 128 N.J.L. 611, 616 (Sup. Ct. 1942), aff'd 130 N.J.L. 173 (E. & A. 1943)]
It is under this stated exception that the judgment herein is entered.
Plaintiff alleges that this arbitrary, irrational and special classification arose from an effort by the Legislature to limit the applicability and hence the burden of the act as much as possible to plaintiff alone, and urges that this motivation by the Legislature is a proper matter for consideration. Defendants argue conversely that no speculative consideration of legislative motivation in a statutory enactment may provide the basis for a determination of constitutional *182 infirmity. Clearly, defendants' position is the general rule; in most jurisdictions "references to the motives of members of the legislature in enacting a law are uniformly disregarded for purposes having to do with its interpretation except as they are expressed in the statute itself." 2A Sutherland, Statutory Construction, supra at 223; see Crawford, Statutory Construction § 213 (1940). However, the New Jersey view is more liberal:
The motive which led to the enactment of the statute is one of the most certain means of establishing its own true sense. [Glover v. Simmons Co., 17 N.J. 313, 319 (1955)]
See also, State ex rel. Richman v. Sperry & Hutchinson Co., 23 N.J. 38, 42 (1957); Maplewood Tp. v. Essex Cty. Bd. of Taxation, 39 N.J. Super. 202, 206 (App. Div. 1956). While the court must exercise due caution in considering possible motives of the Legislature in promulgating the act, see Myerson v. Div. of Employment Security, 43 N.J. Super. 196, 202-203 (App. Div. 1957). "We, as judges, must not be `blind to see' and `shut our minds to truths' that `all others can see and understand.'" Wilentz v. Hendrickson, 135 N.J. Eq. 244, 251 (E. & A. 1944). Thus, courts have viewed the context of events which prompted legislation, State v. Marques, 140 N.J. Super. 363 (App. Div. 1976), have looked to legislative history and discerned a legislative effort to disguise special legislation in general terms, see, e.g., Mason v. Paterson, supra, and have discerned such a design on the face of a classification, see, e.g., Rutten v. Paterson Mayor, 73 N.J.L. 467, 477 (Sup. Ct. 1906); Ziegler v. Gaddis, 44 N.J.L. 363, 366 (Sup. Ct. 1882).
A review of the history of the act leaves little doubt that the termination of operations by plaintiff and the resulting loss of pension benefits to its employees led to the promulgation of the act. The newspaper articles in evidence describe the legislative concern which followed the announced *183 closing of plaintiff's Passaic facility and the revelation that over 800 terminated employees would be denied pension benefits. That the act arose from such a concern would in no way serve to invalidate it as special legislation if the resulting classification were general and reasonable. Many valid general laws have had such individualistic origins. However, the evolution of the act in the Legislature indicates a continuous effort by the lawmakers to restrict the applicability and burden of the act to plaintiff alone, while couching such restrictive classification in general terms. It is the prerogative of the judiciary in determining statutory validity to review the progress of the act through the Legislature, see, e.g., Cattani v. Bd. of Trustees, 69 N.J. 578, 584-585 (1976); N.J. Pharmaceutical Ass'n v. Furman, supra 33 N.J. at 130-131; In re In Progress Trace Wire Communication, 102 N.J. Super. supra; Dept. of Health v. Sol Schnoll Dressed Poultry Co., supra at 176; Neveroski v. Blair, 141 N.J. Super. 365, 377 (App. Div. 1976). It would be myopic to consider the issue of special legislation in this case blindfolded to the obvious events generating its passage. Unquestionably, as witnessed by the documents in evidence, great legislative concern developed from the furor and public outcry, demonstrations, political pressures and press coverage of the undeniably heartrending and devastating circumstances of those of plaintiff's workers whose pension rights were not to vest prior to the termination of their employment. Under these pressures, in this emotional climate, and with legitimate concern for the results of the then existing absence of legislation to remedy the social problem with which they were confronted, the lawmakers acted with uncharacteristic haste. But 24 days after plaintiff's public announcement Assembly Bill 1563 was introduced by 11 Assemblymen, the bill being entitled "The Emergency Pension Act of 1972" and described therein as "an act imposing a tax upon certain employers for the benefit of employees with nonvested pension rights." That statute was a general one, without apparent constitutional *184 infirmity, and quickly passed the Assembly on December 14, 1972, by a vote of 47-4, to the tumultuous ovation of an estimated 300 of plaintiff's employees in the packed Assembly gallery.
Following the Assembly vote the bill was sent to the Senate and a newspaper account at the time, in evidence herein, quoted Senator Joseph Hirkala (D-Passaic) as saying:
The present bill, sponsored by Assemblyman Herbert Klein and passed in the Assembly is too broad in scope and probably will not be released from committee. If passed by the Senate and signed into law by the governor, it could serve as a deterrent to future industry and business moving into New Jersey, because it would effect a tax on every business seeking to cease operation.
The alternative to this broad legislation that would adversly [sic] affect the economic future of the state is to draw specific legislation that would insure only the Manhattan workers of pension benefits.
The chairman of the Senate Labor, Industry and Professions Committee, Senator Michael A. Giuliano (R-Essex), was reported as having indicated that the bill "was being worked on," since the committee felt that the bill might "require an amendment more directly tied to the Passaic problem."
Perhaps if this Assembly bill had been enacted into law it would have withstood plaintiff's assault upon it. But the realities of the consequences of the general law were soon recognized, as they would have been before its passage had it met with a longer period of study and deliberation. It became apparent that the evils of the decades could not be counteracted in little more than a fortnight. The detriments resulting to the industrial and business concerns encompassed by the broad classification in the Assembly bill far exceeded the accomplishment of the desired result of alleviating the plight of plaintiff's employees. The adverse reaction of the business community, the probability that the legislation would deter the future economic expansion of the State, and similar matters of concern undoubtedly precipitated the amendments which followed. It was found necessary *185 to narrow the classification, and this was accomplished by the Senate Labor, Industry and Professions Committee preparing the act in its final form, which at the time of its enactment had immediate application only to plaintiff. This stipulated fact does not render it special legislation, but it is a proper consideration.
The act, unanimously passed by the Senate on March 19, 1973 in the presence of over 400 of plaintiff's employees, passed the Assembly without debate ten days later and was signed into law on May 9, 1973 by Governor Cahill, who at that time stated his awareness of its applicability to plaintiff, of the opposition thereto which had been expressed, and the necessity for a judicial review as to its validity.
Admittedly, if the basis of classification is valid, it is immaterial how many or how few compose the class. "The fact that `there happens to be but one individual of the class, or one place where it produces effect' does not convert an otherwise general law into a special one." State v. Garden State Racing Ass'n, 136 N.J.L. 173, 180 (E. & A. 1947), citing numerous instances in which such legislation has been sustained. But when the classification is unequal, unreasonable or discriminatory the Constitution is transgressed and the statute must fall. See e.g., Koons v. Atlantic City Bd. of Comm'rs, 134 N.J.L. 329 (Sup. Ct. 1946) aff'd per curiam 135 N.J.L. 204 (E. & A. 1946), and Alfred Vail Mut. Ass'n v. New Shrewsbury, supra, where the court, in invalidating a statute so drafted as to in effect limit the application of the statute to one school district, recognized that this would not make it special legislation if the classification were "germane to the purpose of the enactment, resting on characteristics that substantially differentiate the school district included from those school districts excluded * * *" (58 N.J. at 48-49). If "it has the vice of discrimination against members of a class to which the subject matter of the legislation reasonably and naturally relates," Koons v. Atlantic City Bd. of Comm'rs, *186 supra, it is an invalid classification, whether the class includes one or one thousand.
Certainly the spirit of this statute is that of a special law. In considering whether its substance is so it is necessary to consider the enactment in its totality as well as inspecting its individual provisions. Many of the singular aspects of the statute are individually defensible but when considered in the light of the coordinate provisions and the overall effect of the classification found therein the constitutional defects are disclosed. Admittedly, the reason precipitating the legislative action is not determinative, for even a statute intended to be special may be a general one. But the circumstances surrounding the Senate amendment of the Assembly bill give additional meaning to the amendments in the context of the issue under consideration.
The original Assembly bill encompassed all employers "who employ 50 or more people within this State." As amended, the act narrows the class of employers to those employing "500 or more people within this State at any time within one year prior to the date that the employer ceases to operate at such location." The Assembly bill included every employer so defined without exemption, whereas the act in § 2(e) provides for exemption of those employers otherwise embraced offering "to retain all of the employees at another location within the State." All employers, whether or not providing a pension plan for their employees, were included in the Assembly bill, while the act is applicable only to employees with existing pension plans. Accordingly, the manner for computation of the tax was changed from one in the Assembly bill "equal to the lesser of * * * (a) the employer's highest weekly payroll * * * during the calendar year next preceding the date when the employer ceases to operate * * * multiplied by 52", and (b) "the amount of all nonvested pensions of all persons employed by such employer * * *," to a tax in the act similar only to that in category (b) of the Assembly bill.
*187 Further, in the Assembly bill the tax was based upon the amount of wages or nonvested pensions of all of the employees of the employer to be taxed, but in the act a further limitation is imposed by including in the tax computation the nonvested pension benefits of only "such employees of the employer who have completed 15 years of covered service under the pension plan of the employer." And finally, the Assembly bill contained no time limitation upon its effectiveness, whereas the act provides for but a one-year life by directing that "the tax imposed hereby shall expire and be inoperative after July 1, 1974."
None of these amendments offered any danger of plaintiff's escape from the legislative net intended to ensnare it. Plaintiff was the target and the act hit its mark. But at the same time the Legislature effectively eliminated all but a minimal possibility that any other "person, firm or corporation" employing people in this State would be subject to this substantial penalty. Of those employers conducting business in the State, all employing less than 500 persons were relieved of the obligation of the tax should they cease to operate a place of employment under facts encompassed within the statutory definition. This amendment removed from the classification and potential tax liability the great majority of the State's employers, leaving covered only the major corporations. But at the same time, of course, contrary to the furtherance of the stated purpose of the act, the amendment also ousted from the benefits of the statute the correspondingly great majority of those employees for whose protection the act purportedly was promulgated. And the classification was further narrowed to exclude those employers without pension plans, although the plight of discharged employees of such employers is none the less needing of alleviation. Then employers with pension plans but without employees with 15 years of covered service thereunder were eliminated. And of those remaining in the category, exemption was provided for employers retaining all of the employees at another location within the *188 State. With the classification narrowed to that degree, plaintiff remained the only employer within the classification having announced its intention to "cease to operate a place of employment" within the statutory definition.
And then, in an apparent effort to provide an avenue of escape for any other employer remaining within the classification which might thereafter find it necessary to terminate employment in a manner similar to plaintiff, the statute provided for an expiration date little more than a year thereafter. Thus, any such employer, under the act as enacted and prior to the one-year extension thereof, had only to delay its termination date for a short period of time to avoid the consequences of the act and deny to its employees the benefits thereof.
The act as so amended still regulated plaintiff, whose closing had sparked the legislation, but its more restrictive classification eliminated or exempted from the act many other employers who would otherwise have been regulated by the original Assembly bill. But the keystone of the invalidity is not the mere elimination or exemption of those who would otherwise have been included, but the finding that the classification is illusory, excluding from the benefits of the tax employees who logically should have been included and from liability for the tax employers who logically should have been included. In this respect the act is within the constitutional injunction. In Koons v. Atlantic City Bd. of Comm'rs, supra, the inquiry was framed:
Is the legislation of such a character as that it is equally appropriate to all forming the statutory class, and is that class embracive of all in like situations and circumstances, and therefore natural members of the class? [134 N.J.L. at 333]
In the case of the act it is not. "The characteristic constituting the basis of the classification [is not] reasonably appropriate to the object of the law [and] rests upon distinctions that are [not] substantial and [are] merely illusory." *189 Koons v. Atlantic City Bd. of Comm'rs, supra at 332. The classification does not, as required by the language of the cited case, embrace all naturally falling into the category, but instead omits therefrom many who should be included. It has no reasonable basis and is lacking in the necessary freedom from artificiality and arbitrariness.
This ongoing effort by the Legislature evidences a motivation to disguise in general terms a special classification, aimed primarily at plaintiff, and, while not itself providing a basis for a determination of unconstitutionality, confirms that the classification is arbitrary and without rational basis.
In summary, then, as stated by the court in Washington Nat. Ins. Co. v. Bd. of Review, 1 N.J. 545 (1949):
What we have is a subdivision of a wholly natural class without any reason whatever related to the service of the statutory object or the public interest in any of its diverse manifestations. [at 555]
The classification is without any demonstrable factual basis, Meadowlands Regional Div. Agency v. State, supra, which would permit the application of the presumption that the Legislature acted rationally in the establishment thereof. The act is void as special legislation violative of N.J. Const. (1947), Art. IV, § VII, pars. 8, 9.
Plaintiff also argues a denial of equal protection resulting from the statutory discrimination. The equal protection clause of the Fourteenth Amendment secures equality of right by forbidding arbitrary discrimination between persons similarly circumstanced. Schmidt v. Bd. of Adjustment, Newark, 9 N.J. 405, 418 (1952); Levy v. Louisiana, 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436, reh. den. 393 U.S. 898, 89 S. Ct 65, 21 L.Ed. 185 (1968). However, equal protection does not require that all persons be dealt with identically.
In short, equal protection does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not bring about the full reform or result intended to be produced. In *190 an area of many competing pressures, the constitution is satisfied if the Legislature, in responding to what it conceived to be living facts calling for regulation, did not disregard reason in drawing its lines. [N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 602, app. dism., cert. den. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967)]
State legislatures are presumed to have acted within their constitutional powers, despite the fact that in practice their laws result in inequality.
The test of whether a statute denies equal protection of the laws is essentially the same as that which determines whether it constitutes special legislation, Robson v. Rodriquez, 26 N.J. 517 (1958).
A statute * * * does not violate due process or equal protection so long as the classification or discriminatory treatment effected thereby has some reasonable basis, is fairly related to a legitimate legislative purpose, and may be justified upon any state of facts reasonably conceived. (Citations). Snedeker v. Bd. of Review, Div. of Employment Security, 139 N.J. Super. 394, 403 (App. Div. 1976). [26 N.J. at 526]
The analysis is similar under both the New Jersey and United States Constitutions. Cf. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Hudson Circle Servicenter, Inc. v. Kearny, 70 N.J. 289 (1976); Borland v. Bayonne Hospital, 122 N.J. Super. 387, 397 (Ch. Div. 1973), aff'd 136 N.J. Super. 60 (App. Div. 1975). The act under review does not involve a "suspect classification" or interfere with a "fundamental right" which would mandate application of a strict standard of judicial review, see San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 29, 93 S.Ct. 1278, 36 L.Ed.2d, 16 (1973), reh. den., 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973), and thus this review of the act must be limited to a determination as to whether all persons within a class reasonably selected are treated alike and whether the classification involved "rests upon some ground of difference having a real and substantial relation to the *191 basic object of the particular enactment or on some relevant consideration of public policy." Wilson v. Long Branch, supra.
In adjudicating plaintiff's charge that the act violates the equal protection guarantees, as with the issue relating to special legislation, recognition must be given to the principle that the Legislature has broad discretion in the area of permissible classification, Passaic v. Consolidated Police, etc., Pension Fund Comm'n, supra; Madden v. Kentucky, 309 U.S. 83, 87-88, 60 S.Ct. 406, 84 L.Ed. 590 (1940), and that classifications devised by the Legislature will be presumed to rest upon a rational basis if there be any conceivable state of facts which would afford reasonable support for them, Robson v. Rodriquez, supra 26 N.J. at 524; Fair Housing Council, Inc. v. N.J. Real Estate Comm'n, 141 N.J. Super. 334, 338 (App. Div. 1976); see Wurtzel v. Falcey, 69 N.J. 401 (1976).
In determining that the act constitutes special legislation, the classification by which the act is limited in application to employers of 500 or more persons has been found to be irrational, without any demonstrable factual basis sufficiently related to the purpose of the act (i.e., protection of employees' pension benefits) to justify the classification (i.e., the exclusion of a large part of the employees in the State from the protections of the act). Under the virtually identical equal protection test this exclusionary classification is unsupported by any conceivable factual basis reasonably related to the statutory purpose, thus rendering the act also void as violative of the equal protection guarantees of the New Jersey and United States Constitutions.
In Wiley Motors, Inc. v. Unemployment Comp. Comm'n, 130 N.J.L. 30 (Sup. Ct. 1943), aff'd 131 N.J.L. 228 (E. & A. 1944), the Unemployment Compensation Act, R.S. 43:21-19, was challenged as violative of the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution in that the statute applied only to employers *192 of eight or more employees. Our former Supreme Court upheld the validity of the statute and the classification, stating that
Establishing at eight the number of employees which brings the employing unit within subject status does not seem to us unreasonable, arbitrary or capricious, bearing in mind that the line must be drawn at some point, and that it is within the competence of the legislature to determine that eight employees was the lowest figure which it could set, having due regard to the incidence of involuntary unemployment in small employments and the necessity for the filing of reports and investigation thereof by the body charged with carrying out the plan. [at 35]
Defendants argue that the act does no violence to the equal protection guarantees by setting at 500 the number of employees which brings an employer within the regulation of the act and affords to his employees statutory protection. However, defendants have been unable to suggest and it is difficult to conceive of any basis properly related to the purpose of the act which can justify this exclusion of a large segment of the employees of the State from the protections of the act. As hereinbefore noted in the discussion of the special legislation issue, the fact that closings of small firms may have a less harmful impact on the state economy as a whole than do closings of large firms is unrelated to the legislative purpose of protecting employees' pension benefits and accordingly does not justify the exclusion. Kline v. N.J. Racing Comm'n, supra. The argument that small firms would be more heavily burdened by the act is, as also heretofore noted, probably fallacious since in most cases the burden of compliance with the act will be approximately proportionate to the magnitude of the employer, but even if true, is unrelated to the legislative purpose and cannot justify the large-scale exclusion at issue here. Analysis of the act taken as a whole and of its evolution through the legislative amending process strongly indicates that the Legislature was desirous of alleviating the human costs of plaintiff's termination of operations *193 without an adequate pension program, but at the same time was reluctant to impose the burden of the act upon more than a bare minimum of the employers in the State.
The act contains two vices, for on the one hand it has "singled out for special favor," without any rational basis, Washington Nat. Ins. Co. v. Bd. of Review, supra, the limited class of employees who are to benefit from the statutory protection, and on the other has "subjected to hostile and discriminatory legislation" the limited class of employers upon whom the tax is assessed. Gulf, C. & F.S. Ry. Co. v. Ellis, supra 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. at 668.
Contrary to what defendants argue, discrimination clearly has been established and justification for such discrimination against the limited group of employers and favorable to only the limited group of employees is not to be found in the act. Plaintiff has met the burden of showing the absence of a rational basis for the discriminatory classification. No doubt between the effective date of the act, May 9, 1973 and the extended termination date thereof, July 1, 1975, many employers who should have been included in the more expansive and rational classification of a general law escaped tax liability and many employees were consequently denied statutory benefits. And since July 1, 1975 all employers circumstanced as plaintiff was at the time of the enactment likewise have had no tax liability imposed upon them. The multi-million-dollar tax liability imposed upon plaintiff under these circumstances, regardless of the commendable motivation which inspired it, is the embodiment of the discrimination interdicted by coordinate provisions of the State and Federal Constitutions. This arbitrary evasion of the constitutional requirement of reasonableness in classification is an evasion which the court must "be alert to detect and suppress." East Orange v. Bd. of Water Comm'rs, 79 N.J. Super. 363, 371 (App. Div. 1963), aff'd 41 N.J. 6 (1963); Wilentz v. Hendrickson, supra.
*194 It is natural that sympathy be generated by the plight of plaintiff's employees and the hardships suffered by those terminated without vested pensions. Undoubtedly such sympathetic considerations at least in part motivated this legislative reaction to the problem confronted by the act, but such sympathy cannot provide the basis for a dilution of our constitutional protections by sustaining a statute which does violence thereto. The act, adopted to mitigate and relieve these hardships, has been reviewed with "a mind sympathetic to its aims which recognizes the difficulties inherent in formulating a precise expression of legislative intent," Lane v. Holderman, 23 N.J. 304, 323 (1957), but the court is constrained despite its sympathy with the legislative aims to declare the act void as violative of the equal protection guarantees of the New Jersey and United States Constitutions.
The foregoing determination of the unconstitutionality of the act renders unnecessary the expression of an opinion upon the several additional grounds upon which plaintiff asserts that the act disregards constitutional protections. The contention that the act constitutes a discriminatory burden upon interstate commerce, in violation of the Commerce Clause of the United States Constitution, Art. I, § 8, par. 3, has been substantially rejected by the interpretation of the language of § 2(e) of the act contrary to that construction urged by plaintiff.
To the extent that a broader allegation of unconstitutionality was presented, the arguments are without substance. The attack upon the act based upon alleged unlawful intrusion into an area of labor negotiations preempted by federal legislation in violation of the Supremacy Clause of the United States Constitution has been the subject of a recent opinion and judgment by the United States District Court for the District of Minnesota. In White Motor Corp. v. E.I. Malone, 412 F. Supp. 372 (D.C. Minn. 1976), decided March 8, 1976, the court ruled adversely to the position *195 taken by plaintiff herein on the same argument directed to a similar statute. While there are substantial differences between the New Jersey and Minnesota statutes, they are not pertinent to the preemption issue. Upon the authority of and for the reasons stated in that opinion the claim of preemption is rejected. Similarly, except to the extent that they parallel the discrimination argument hereinbefore decided, no merit is found in the remaining contentions of constitutional invalidity presented by plaintiff. However, one of them, involving an issue of importance under the New Jersey Constitution, warrants additional comment.
Plaintiff alleges a procedural infirmity in the passage of the act resulting from noncompliance with the requirement that revenue bills originate in the Assembly.
All bills for raising revenue shall originate in the General Assembly; but the Senate may propose or concur with amendments, as on other bills. [N.J. Const. (1947), Art. IV, § 6, par. 1]
As noted infra, Assembly Bill 1563 was not a revenue measure within the meaning of the constitutional direction that such bills shall originate in the Assembly. Therefore, compliance with N.J. Const. (1947), Art. IV, § 6, par. 1 was not required. See Kervick v. Bontempo, 29 N.J. 469, 476 (1959) (holding a single-object, fund-raising measure not a revenue bill is not subject to the Bill origin clause); In re Paton, 114 N.J. Eq. 324 (Prerog. 1933) (holding that while in England amendments to taxation acts resulting in decreased revenue must originate in the House of Commons, there is no such authority in this country); (contra, Perry County v. Selma, M. & M.R. Co., 58 Ala. 546 (Sup. Ct. 1877), holding a bill reducing taxes to be a revenue measure which must originate in the House). See also, cases collected in Annotation 4 A.L.R.2d 973 (1949).
However, even if the bill be considered one for raising revenue and thus subject to this constitutional provision, *196 the allegation of procedural noncompliance is without substance.
Plaintiff alleges that Assembly Bill 1563 was so altered and expanded in substance and form as to constitute a new bill originating in the Senate. Consideration of this issue requires a review of the history of the enactment from its introduction in the Assembly to its execution by the Governor. Assembly Bill 1563 was introduced in the General Assembly on November 20, 1972 and passed on December 14, 1972. It was received by the Senate that day and referred to the Senate Labor, Industry and Professions Committee. On February 22, 1973 a Committee Substitute Bill was favorably reported to the Senate and given a second reading. However, on March 19, 1973 the Senate adopted a resolution rescinding its prior adoption of the Committee report and its action in granting the Committee Substitute Bill a second reading. Again the bill was referred to the Committee, which then immediately reported out Assembly Bill 1563 with Senate Committee Amendments which were adopted by the Senate. The bill was then given a second reading, the Senate adopted a resolution declaring it an emergency measure, the bill was given a third reading, and it was passed unanimously. On March 19, 1973 the Assembly received Assembly Bill 1563 with Senate Committee Amendments and referred it to the Labor Committee. Three days later the bill with Senate Committee Amendments was reported out favorably by the Labor Committee and given its second reading. On March 29, 1973 the Assembly took its final action by adopting a resolution concurring in the Senate Committee Amendments, and Assembly Bill 1563 with Senate Committee Amendments was signed into law by Governor Cahill on May 9, 1973.
This legislative history complies with the constitutional procedure. Although admittedly the bill was originally characterized as a "Senate Committee Substitute," this characterization was rescinded, and plaintiff's argument that *197 the bill originated in the Senate because of the substantial changes adopted by that body is without substantial merit.
The question of legislative procedural irregularity has been considered in other jurisdictions. In Shadrick v. Bledsoe, 186 Ga. 345, 198 S.E. 535 (Sup. Ct. 1936), the court considered a question closely analogous to the issue here in question, i.e., whether a revenue tax act introduced in the Senate as a substitute for a bill originating in the House of Representatives violated the constitutional requirement that revenue bills must originate in the House of Representatives. Holding that since the Senate could propose or concur in amendments, and a substitute is a recognized method of amendment, that court found the act not violative of the Georgia Constitution.
In like manner, the United States Supreme Court has upheld the validity of Senate amendments and substitutions where the bill originated in the Houes of Representatives. Flint v. Stone Tracey Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911) (Senate's substitute providing for tax on corporations in lieu of inheritance tax passed by House, held valid as part of a general revenue raising bill); Rainey v. United States, 232 U.S. 310, 34 S.Ct. 429, 58 L.Ed. 617 (1914) (Senate provision imposing excise tax on foreign-built pleasure yachts upheld as valid amendment to tariff act originating in House).
All counsel cite In re Ross, 86 N.J.L. 387 (Sup. Ct. 1914), as supportive of their positions. In that case a revenue bill originated in and was first passed by the Senate and then referred to the House Committee on Taxation, which referred it out favorably without amendment. Following two readings on the floor, the bill was sent back to Committee, which then reported out an Assembly substitute, passed it, and delivered it to the Senate. The Senate passed the bill, which was then signed by the Governor. Finding that although the act originated in the Senate, the Assembly had discarded the Senate version, introduced and passed this substitute measure which was then passed by the Senate, the *198 former Supreme Court found no constitutional violation. In so ruling, after stating its recognition of the presumption of constitutionality of statutes, the court said:
* * * the action of the senate when this "substitute" was sent to it by the house, in passing it as an assembly bill instead of treating it as a senate bill which had been amended in the assembly, and merely concurring in the amendments, is persuasive that it accepted [the] substitute as an assembly bill because its attention had been called to the fact that a revenue bill could not constitutionally originate in the senate. * * * [at 391]
Ross is not as analogous as counsel argue, but it does evidence the broad interpretation to be extended to this constitutional provision when an issue of compliance is raised. In Ross the bill originated in the Senate rather than in the Assembly, as did Assembly Bill 1563. The Senate exercised its prerogative to amend Assembly Bill 1563 and most of the changes effected have been discussed at length earlier herein. Those changes constituted amendments for which there is specific constitutional authority. In its action in rescinding the "Senate Committee Substitute" and adopting the amendments to the Assembly bill made by the Committee, the Senate evidenced its intent for the very purpose of avoiding the procedural attack now being launched against the validity of the law. The action taken was clearly within the constitutional ambit of Senatorial power, whether the amendments are characterized as "Senate Committee Substitute" (a characterization later rescinded), or amendments. The basic purpose of Assembly Bill 1563 as amended by the Senate remained the same  to benefit employees with nonvested pension rights and to provide for assessment and collection of funds from certain employers. Semantics cannot be permitted to obscure the actuality of what occurred.
An additional basis for this conclusion may be found in the nature of the tax imposed. In Mikell v. Philadelphia School District, 359 Pa. 113, 58 A.2d 339 (1948), the Pennsylvania Supreme Court confronted the issue of *199 whether the statute under review was a revenue-raising measure which originated in the Senate instead of the House of Representatives, and was therefore violative of Art. III, § 14 of the Pennsylvania Constitution. In that case, as here, the revenue obtained from the tax imposed was not used for general governmental purposes. There it was a personal property tax imposed upon the residents of first-class school districts "for public school purposes." In finding the act valid the court held that
* * * to qualify as a bill within the purview of the cited constitutional provision, at least the revenue derived from the tax imposed should be coverable into the treasury of the exacting sovereign for its own governmental uses, and that is not the situation in the present instance.
Quoting from United States v. Norton, 91 U.S. 566, 568, 23 L.Ed. 454, where the similar provision of the United States Constitution (Art. I, § 7) was under review, the court further observed that
* * * according to the practical * * * construction of the Constitution, the particular limitation has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally create revenue. [Emphasis in the original]
The act, while perhaps a revenue-raising bill in the broad sense, is not one in the "strict sense of the words" so as to invoke the constitutional provision with respect to the origin of revenue bills. (See also, Bernards Tp. v. Allen, 61 N.J.L. 228, 232-235 (E. & A. 1897), tracing the history of the constitutional provision and the power to tax from the Norman kings of England.)
Of additional interest on this subject are two further grounds of possible support for the constitutionality of the act upon which the court need not rely in determining this issue. The first is the finding in Mikell v. Philadelphia School District, supra, that "the clause concerning the place *200 of origin of a bill for raising revenue is a procedural directive and not a substantive interdict," and that therefore "a revenue statute, once enacted, is not inherently defective simply because the bill originated in the Senate and was passed first by that body." The other is the applicability of the "enrolled bill rule" which accords an enrolled statute a presumption of legislative compliance with constitutionally prescribed procedure. Pangborn v. Young, 32 N.J.L. 29 (Sup. Ct. 1866); In re Hague, 104 N.J. Eq. 31, 64-66 (Ch. 1929), aff'd 104 N.J. Eq. 369 (E. & A. 1929). See generally, Grant, "New Jersey's Popular Action In Rem to Control Legislative Procedure," 4 Rutgers L. Rev. 391 (1949).
For the foregoing reasons stated, judgment will be entered declaring unconstitutional the Private Nonvested Pension Benefits Protection Tax Act, L. 1973, c. 124.